[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 104 
Plaintiffs, John Kenneth Reed and his wife, Rene Reed,[1] appeal from a summary judgment granted in favor of the defendants, Ed Brunson, Sherman Howell, Jim Babbington, Bill Perkins, and Gerald Phillips (hereinafter sometimes referred to as co-employees), in this action to recover damages based on personal injury. We affirm.
After examining the materials submitted to the trial court, including numerous exhibits and the depositions of the plaintiff and co-employees, it appears to us that the following material facts are not in dispute: The plaintiff was injured when he caught his hand in a concrete mixer at Faulkner Concrete Pipe Company's plant in Mobile. Faulkner manufactures concrete pipe and is headquartered in Hattiesburg, Mississippi. At the time of his injury, the plaintiff had been employed at Faulkner as a laborer for approximately one year. The defendants were co-employees of the plaintiff. Bill Perkins is president of Faulkner and works in Hattiesburg; Jim Babbington is production manager and safety coordinator, and also works in Hattiesburg; Ed Brunson is manager of the Mobile plant; Sherman Howell is a foreman at the Mobile plant and was the plaintiff's immediate supervisor; Wayne Phillips is a maintenance worker at the Mobile plant. Concrete Equipment Company, which manufactured the mixer, was also named as a defendant; however, it is not a party to this appeal.[2]
The mixer in question consists primarily of a large drum in which the concrete is mixed, and a rubber, motorized drive wheel that presses against the drum and rotates it. The point where the drive wheel presses against the drum is called the "nip-point." Although there is evidence tending to show that the mixer was sold to Faulkner with a guard shielding the front of the drive wheel, the mixer was not equipped with side guards shielding the nip-point. On the day of the accident, Howell, contemplating a plant inspection, instructed the plaintiff to clean up concrete on the floor around the mixer.[3] The mixer was in operation at the time the plaintiff was working around it. The plaintiff was using a pneumatic air powered chipping gun to remove hardened concrete from under the drive wheel when he lost his balance and fell toward the mixer, catching his hand in the nip-point.[4]
The plaintiff filed suit, alleging that his injury was proximately caused by the co-employees' willful (count one), negligent (count two), or wanton (count three) conduct. The substance of these allegations is that the co-employees failed to instruct the plaintiff how to safely do his job and, also, failed to furnish him with a reasonably safe place in which to work. *Page 105 
There is at least a scintilla of evidence of negligence and probably of wantonness of some, but not all, of Reed's co-employees, which proximately contributed to Reed's injuries. Section 3 of Act No. 85-41, Acts of Alabama, Second Special Session 1984-85 (§ 25-5-11, Code of Alabama 1975, as amended), hereinafter referred to as the "Act," limits actions for personal injuries that an employee, who is receiving benefits under the Alabama Workmen's Compensation Act, can recover against an "officer, director, agent, servant, or employee of the same employer" to actions for willful conduct that results in or proximately causes injury or death. The plaintiff maintains that the Act is unconstitutional; of course, if it is constitutional, then the trial court's action in granting summary judgment to the co-employees on the counts seeking recovery for negligence and wantonness should be affirmed.
It is prudent to view the Act in its historical perspective. To do so, it is necessary for us to view American workmen's compensation acts in their historical perspective. The growth of the Industrial Revolution resulted in many job-related injuries for which compensation was sought in the courts. The common law was not kind to these actions, and the vast majority of the claims were defeated by the common-law defenses of assumption of the risk, contributory negligence, and the fellow-servant doctrine. 1A A. Larson, The Law of Workmen'sCompensation, § 4.30 (1972). The non-responsiveness of the common law to an idea whose time had come caused legislators to devise a compromise system for the recovery of compensation for job related injuries and deaths. Though Professor Larson credits Missouri with beginning the workmen's compensation trend (A. Larson, The Law of Workmen's Compensation, note 7, at § 5.20), New York enacted the first American workmen's compensation statute in 1910. W. Prosser, Handbook of the Lawof Torts, § 80 (4th ed. 1971).
This legislation was challenged by employers, and the New York act was held unconstitutional on the ground that it permitted liability without fault and was thus a taking of property without due process. Ives v. South Buffalo Ry.,201 N.Y. 271, 94 N.E. 431 (1911). Other workmen's compensation acts were struck down as violating the constitutional right to equal protection. See Cunningham v. Northwestern Improvement Co.,44 Mont. 180, 119 P. 554 (1911). The New York act was amended to make its coverage elective, after which the act was upheld by New York courts. In New York Central R.R. v. White,243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917), the railroad appealed to the United States Supreme Court on the same ground that had been successful, prior to the amendment of the act, in the courts of New York. Justice Pitney, writing for the Court, upheld the constitutionality of the New York workmen's compensation act and wrote:
 "In considering the constitutional question, it is necessary to view the matter from the standpoint of the employee as well as from that of the employer. For while plaintiff in error is an employer, and cannot succeed without showing that its rights as such are infringed [citations omitted] yet, as pointed out by the court of appeals in the Jensen Case (215 N.Y. [514] 526 [109 N.E. 600]), the exemption from further liability is an essential part of the scheme, so that the statute if invalid as against the employee is invalid as against the employer.
 "The close relation of the rules governing responsibility as between employer and employee to the fundamental rights of liberty and property is of course recognized. But those rules, as guides of conduct, are not beyond alteration by legislation in the public interest. No person has a vested interest in any rule of law entitling him to insist that it shall remain unchanged for his benefit. [citations omitted] The common law bases the employer's liability for injuries to the employee upon the ground of negligence; but negligence is merely the disregard of some duty imposed by law; and the nature and extent of the duty may be modified by legislation, with corresponding change in the test of negligence. Indeed, liability may be imposed for the consequences of a failure to comply *Page 106 
with a statutory duty, irrespective of negligence in the ordinary sense. . . .
 "The fault may be that of the employer himself, or — most frequently — that of another for whose conduct he is made responsible according to the maxim respondeat superior. In the latter case the employer may be entirely blameless, may have exercised the utmost human foresight to safeguard the employee; yet, if the alter ego while acting within the scope of his duties be negligent — in disobedience, it may be, of the employer's positive and specific command — the employer is answerable for the consequences. It cannot be that the rule embodied in the maxim is unalterable by legislation.
 "The immunity of the employer from responsibility to an employee for the negligence of a fellow employee is of comparatively recent origin, it being the product of the judicial conception that the probability of a fellow workman's negligence is one of the natural and ordinary risks of the occupation, assumed by the employee and presumably taken into account in the fixing of his wages. [citations omitted] The doctrine has prevailed generally throughout the United States, but with material differences in different jurisdictions respecting who should be deemed a fellow servant and who a vice-principal or alter ego of the master, turning sometimes upon refined distinction as to grades and departments in the employment. [citation omitted] It needs no argument to show that such a rule is subject to modification or abrogation by a State upon proper occasion.
 "The same may be said with respect to the general doctrine of assumption of risk. By the common law the employee assumes the risks normally incident to the occupation in which he voluntarily engages; other and extraordinary risks and those due to the employer's negligence he does not assume until made aware of them, or until they become so obvious that an ordinary prudent man would observe and appreciate them, in either of which cases he does assume them, if he continues in the employment without obtaining from the employer an assurance that the matter will be remedied; but if he received such an assurance, then, pending performance of the promise, the employee does not in ordinary cases assume the special risk. [citation omitted] Plainly, these rules, as guides of conduct and tests of liability, are subject to change in the exercise of the sovereign authority of the State.
 "So, also, with respect to contributory negligence. Aside from injuries intentionally self-inflicted, for which the statute under consideration affords no compensation, it is plain that the rules of law upon the subject, in their bearing upon the employer's responsibility, are subject to legislative change; for contributory negligence, again, involves a default in some duty resting on the employee, and his duties are subject to modification.
". . .
 "Of course, we cannot ignore the question whether the new arrangement is arbitrary and unreasonable, from the standpoint of natural justice. Respecting this, it is important to be observed that the act applies only to disabling or fatal personal injuries received in the course of hazardous employment in gainful occupation. Reduced to its elements, the situation to be dealt with is this: Employer and employee, by mutual consent, engage in a common operation intended to be advantageous to both; the employee is to contribute his personal services, and for these is to receive wages, and ordinarily nothing more; the employer is to furnish plant, facilities, organization, capital, credit, is to control and manage the operation, paying the wages and other expenses, disposing of the product at such prices as he can obtain, taking all the profits, if any there be, and of necessity bearing the entire losses. In the nature of things, there is more or less of a probability that the employee may lose his life through some accidental injury arising out of the employment, leaving his widow or children deprived of their natural support; or that he may sustain an injury not mortal but *Page 107 
resulting in his total or partial disablement, temporary or permanent, with corresponding impairment of earning capacity. The physical suffering must be borne by the employee alone; the laws of nature prevent this from being evaded or shifted to another, and the statute makes no attempt to afford an equivalent in compensation. But, besides, there is the loss of earning power; a loss of that which stands to the employee as his capital in trade. This is a loss arising out of the business, and, however it may be charged up, is an expense of the operation, as truly as the cost of repairing broken machinery or any other expense that ordinarily is paid by the employer. Who is to bear the charge? It is plain that, on grounds of natural justice, it is not unreasonable for the State, while relieving the employer from responsibility for damages measured by common-law standards and payable in cases where he or those for whose conduct he is answerable are found to be at fault, to require him to contribute a reasonable amount, and according to a reasonable and definite scale, by way of compensation for the loss of earning power incurred in the common enterprise, irrespective of the question of negligence, instead of leaving the entire loss to rest where it may chance to fall — that is, upon the injured employee or his dependents. Nor can it be deemed arbitrary and unreasonable, from the standpoint of the employee's interest, to supplant a system under which he assumed the entire risk of injury in ordinary cases, and in others had a right to recover an amount more or less speculative upon proving facts of negligence that often were difficult to prove, and substitute a system under which in all ordinary cases of accidental injury he is sure of a definite and easily ascertained compensation, not being obliged to assume the entire loss in any case but in all cases assuming any loss beyond the prescribed scale." 243 U.S. at 197-204, 37 S.Ct. at 250-53 (emphasis supplied).
In 1919, the Alabama Legislature copied and passed a version of the Minnesota workmen's compensation act. WilbornConstruction Co. v. Parker, 281 Ala. 626, 206 So.2d 872 (1968). This act took effect on January 1, 1920. Act 245, Acts of Alabama 1919, pages 206-39. As between the employer and employee, in exchange for a guarantee of compensation, based on the type of injury received and the weekly wages of the employee, the employee agreed to allow the employer to be immune from common law liability. The act was mutually elective.
Section 10 1/2 provided:
 "The rights and remedies herein granted to an employee shall exclude all other rights and remedies of said employee, his personal representative, parent, dependents or next of kin, at common law, by statute or otherwise on account of said injury, loss of services or death. . . ." (emphasis supplied)
Section 32 of the Act provided:
 "[W]here an injury or death for which compensation is payable under part 2 of this act is caused under circumstances also creating a legal liability for damages on the part of any party other than the employer, such party also being subject to the provisions of part 2 of this act, the employee in case of injury, or his dependents in case of death, may, at his or their option, proceed either at law against such party to recover damages, or against the employer for compensation under part 2 of this act, but not against both." (emphasis supplied)
It is evident that in the initial comprehensive Alabama workmen's compensation plan, the Legislature intended to exclude actions against co-employees when an employee elected to receive benefits under the act.
In Woodward Iron Co. v. Bradford, 206 Ala. 447, 90 So. 803
(1921) the constitutionality of the Alabama Workmen's Compensation Act was first challenged. This Court held that, because coverage under the act was elective, the employer waived his constitutional objections by choosing coverage under the act. The constitutionality of the act was again challenged in Chapman v. Railway Fuel Co., 212 Ala. 106, 101 So. 879
(1924). In Chapman, the *Page 108 
Court adopted the rule enunciated by the United States Supreme Court in New York Central R.R. v. White, supra; this Court at212 Ala. at 109, 101 So. at 881, wrote: "[N]o one has any vested right under the Constitution to the maintenance of common-law doctrines in statutory provisions regulating the relations between employer and employee in respect of rights and liabilities growing out of accidental injuries"; and "an act abolishing rights and defenses, the parties being free to accept or reject, violates no constitutional rights. All such attacks upon laws of this character have failed of their purposes." Until the Court's decision in Grantham v. Denke,359 So.2d 785 (Ala. 1978), the Court held that the elective nature of the workmen's compensation act allowed the Legislature to incorporate anything into it that the parties could incorporate into a private contract. In Owens v. Ward, 49 Ala. App. 293, 29596, 271 So.2d 251 (1972), the Court of Civil Appeals wrote:
 "There is no question but that the Workmen's Compensation Act of Alabama is contractual.
 ". . . By accepting the provisions of the Workmen's Compensation Act, it becomes the contract between employer and employee insofar as rights or remedies for injury in employment are concerned, and all others, whether common law or statutory, are waived."
In 1947, the Legislature removed the requirement that the injured employee elect between a common-law action against an allegedly negligent third party and compensation available from his employer under the Alabama Workmen's Compensation Act. Act 635, Acts of Alabama 1947. The third party was defined as a "party other than the employer."
In United States Fire Insurance Co. v. McCormick, 286 Ala. 531,536, 243 So.2d 367, 37 (1970), the Court held that "where there is no expressed legislative mandate to the contrary, a co-employee or fellow servant is a third party tort-feasor within the meaning of the Workmen's Compensation Act." By statutory interpretation co-employees were made amenable to third party actions.
In 1973 the Legislature defined the scope of employer immunity under the Alabama Workmen's Compensation Act, providing that "neither an officer, director, agent, servant or employee of the same employer or his personal representative, shall be considered a party other than the employer against whom such action may be brought." Act 1062, Acts of Alabama 1973, at pages 1771-72. In 1975 the scope of employer immunity was extended to others, including the employer's workmen's compensation insurance carrier and its officers, directors, agents, servants, and employees. Section 25-5-11, Code of Alabama 1975.
In Grantham v. Denke, 359 So.2d 785 (Ala. 1978), the Court held that § 13 of the Alabama Constitution of 1901 ("That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay") invalidated the portion of the statute that extended employer immunity to co-employees. In Grantham, the Court changed its "vested rights approach" to Section 13, which it had adopted as far back as Coosa River Steamboat Co. v. Barclay Henderson,30 Ala. 120 (1857); this approach was reiterated in Peevey v.Cabaniss, 70 Ala. 253 (1881); in Chapman v. Railway Fuel Co., supra (1924); in Gentry v. Swann Chemical Co., 234 Ala. 313,174 So. 530 (1937); and in Pickett v. Matthews, 238 Ala. 542,192 So. 261 (1939). As recently as 1979, one year afterGrantham, in Mayo v. Rouselle Corp., 375 So.2d 449, 451 (Ala. 1979), Justice Almon, writing for the Court, with all Justices concurring, readopted the vested rights approach:
 "Plaintiff contends that § 13 of the Alabama Constitution of 1901 compels a finding that Code 1975, § 7-2-725, is unconstitutional. We cannot agree. This section of the Constitution preserves to all persons a remedy for accrued or vested causes of action. Therefore, the right to bring an action for breach of *Page 109 
warranty by a third person can be modified, limited or repealed as the legislature sees fit, except where such cause of action has already accrued. Pickett v. Matthews, 238 Ala. 542, 192 So. 261 (1939)." (emphasis supplied)
This was criticized in a footnote in Lankford v. Sullivan,Long Hagerty, 416 So.2d 996, 999 (Ala. 1982); and explained in a dissent, concurred in by Justices Jones, Faulkner, Embry, and Adams in Scott v. Dunn, 419 So.2d 1340, 1347 (Ala. 1982):
 "A thorough examination of the cases interpreting § 13 shows that when the legislature has attempted to completely abolish a remedy for a protected right the statute must either eradicate a social evil or provide a quid pro quo. See Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334 (Ala. 1981); Grantham v. Denke, 359 So.2d 785 (Ala. 1978); Ivey v. Dixon Investment Co., 283 Ala. 590, 219 So.2d 639 (1969). Nevertheless, legislation which provides procedural prerequisites to bringing suits, or limits, modifies or merely alters a remedy in some way is valid, subject to a 'vested rights' limitation. See Mayo v. Rouselle Corp., 375 So.2d 449 (Ala. 1979); Pickett v. Matthews, 238 Ala. 542, 192 So. 261
(1939); Swann v. Kidd, 79 Ala. 431 (1885); Martin's Executrix v. Martin, 25 Ala. 201 (1854)."
In Grantham, supra, with Chief Justice Torbert and Justice Maddox dissenting, the Court held that the Legislature could not grant immunity from suit to a co-employee in a job-related accident covered by the Alabama Workmen's Compensation Act. The majority reasoned that co-employee immunity deprives an injured employee of rights and remedies under the common law that are preserved under § 13 of the Alabama Constitution. Though the opinion is silent on this issue, a review of the record inGrantham reveals that the injuries occurred after the enactment of Act No. 86, 4th Ex.Sess, Acts of Alabama 1975. Therefore,Grantham was a departure from the "vested rights approach." The majority held that the "elective" option to be bound by the act reconciled the act with § 13 insofar as immunity granted to the employer is concerned. The election was said to be based on a quid pro quo, with each voluntarily giving up rights guaranteed by § 13 in exchange for benefits or protection under the act; however, the majority was of the view that there was no quid pro quo between the negligent co-employee and the injured employee.
In Grantham, the Court did not cite Jadosh v. Goeringer,442 Pa. 451, 275 A.2d 58 (1971), which had upheld the constitutionality of a statute prohibiting an employee from recovering against a co-employee for a job-related injury for which the employee received workmen's compensation benefits. The Pennsylvania constitutional provision by which the statute was tested was similar to § 13 in the Alabama Constitution: "All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay [emphasis supplied]," Pa. Const. of 1968, Art. I, § 11. Neither did the Court cite Mier v. Staley,28 Ill. App.3d 373, 329 N.E.2d 1 (1975), which likewise upheld the constitutionality of such a statute when challenged by a constitutional provision similar to Alabama's § 13: "Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly [emphasis supplied]," Ill. Const., Art. I, § 12. Instead, the Court, in departing from the precedent of Coosa River Steamboat Co. v. Barclay Henderson,supra; Peevey v. Cabaniss, supra; Chapman v. Railway Fuel Co.,supra; Gentry v. Swann Chemical Co., supra; and Pickett v.Matthews, supra, relied on two Arizona Supreme Court cases,Kilpatrick v. Superior Court, 105 Ariz. 413, 466 P.2d 18
(1970), and Halenar v. Superior Court, 109 Ariz. 27,504 P.2d 928 (1972), which held that such a statute was unconstitutional under the following constitutional provision, which is set out opposite Alabama's § 13 to clearly show the differences between the two provisions: *Page 110 
Art. 18, § 6, Arizona Const.:
 ". . . The right of action to recover damages for injuries shall never be abrogated." (emphasis supplied)
Art. 1, § 13, Alabama Const.:
 ". . . [E]very person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy. . . ." (emphasis supplied)
Article 18, § 6, appears in the labor section of the Arizona constitution (the Alabama Constitution has no similar section), whereas the Alabama, Pennsylvania, and Illinois provisions are in the bill of rights sections of those states' respective constitutions. By this discussion we do not mean to imply that there is any hierarchy of provisions within constitutions based upon where they appear; we are simply noting that it is evident that Art. 18, § 6, of the Arizona constitution specifically applies to employee actions arising out of work-related injuries.
Without discussion, the Court, in Grantham, held: "Nor is there any perceived social evil to be eradicated by legislative exercise of the police power as was the case regarding our motor vehicle guest statute." 359 So.2d at 788.
In Fireman's Fund American Insurance Co. v. Coleman,394 So.2d 334 (Ala. 1980), only Justices Faulkner and Bloodworth concurred in the majority opinion; Justice Jones filed an opinion concurring in the result; Justice Shores filed an opinion concurring in the result, in which Justice Almon concurred; Justice Embry filed an opinion concurring specially; and Justice Beatty filed a dissenting opinion, in which Chief Justice Torbert and Justice Maddox concurred. The majority readopted the reasoning in Grantham and extended it to allow third-party suits against corporate officers and supervising employees.
Justice Shores, in her opinion concurring in the result inFireman's Fund, explained that in Grantham the Court had changed the approach used in testing the constitutionality of statutes against an Art. I, § 13, attack. The "vested rights" approach had been replaced by the "common-law rights approach." She wrote, at page 352:
 "Legislation which abolishes or alters a common-law cause of action, then, or its enforcement through legal process, is automatically suspect under § 13. It is not, however, automatically invalid. Grantham itself restates the established rule that such legislation will survive constitutional scrutiny if one of two conditions is satisfied:
 "1. The right is voluntarily relinquished by its possessor in exchange for equivalent benefits or protection, or
 "2. The legislation eradicates or ameliorates a perceived social evil and is thus a valid exercise of the police power."
In reference to the second standard of review, Justice Shores wrote, at page 353:
 "Of the dozens of cases decided under § 13, however, there are many which involve no deprivation of common-law causes of action, and in which the Court has declined to exercise a stricter than normal standard of review. . . . In this type of case, § 13 is construed as a general prohibition against arbitrary and capricious governmental action. The Court quite properly exhibits a high degree of deference to the legislative decision-making process in these situations because the guidelines for review are so vague. Where common-law causes of action for injury are impaired, however, the mandate of § 13 is explicit."
Justice Beatty, in his dissent in Fireman's Fund, joined by Chief Justice Torbert and Justice Maddox, wrote, at 394 So.2d 355-57:
 "At the outset it should be noted that my sole reason for dissenting at some length in this case is my desire that the questions here presented be resolved on the basis of sound legal doctrine. Adherence to established principles of law is a necessity in a case such as the instant case, for the issues before us are of fundamental importance to the integrity of our democratic system of government which is based upon the existence of three branches. . . .
". . . *Page 111 
 . . . Section 13 does not focus upon any particular remedy, nor does it speak of remedies against specific parties. The essence of the provision is, instead, that an individual is entitled to a remedy for his injuries. Accordingly, a legislative enactment should withstand a Section 13 attack if some remedy is provided a plaintiff for his injuries. See Mier v. Staley, 28 Ill. App.2d 373, 329 N.E.2d 1, 8 (1975). Under the Alabama Workmen's Compensation Act, an injured worker is clearly given a remedy for injuries sustained due to accidents 'arising out of and in the course of his employment.' Code of 1975, § 25-5-31. Although an injured worker is not given a right of action for job-related injuries against all persons (see Code of 1975, §§ 25-5-11, 25-5-53), the undeniable fact remains that 'a remedy' does exist for all injuries of which 'the actual or lawfully imputed negligence of the employer [was] the natural and proximate cause.' Code of 1975, § 25-5-31. That remedy is, of course, the right of the employee to recover workmen's compensation benefits. That an action for negligence will not lie against a co-employee or an insurance inspector is simply irrelevant under Section 13, for 'a remedy' is always provided the injured employee covered by workmen's compensation. The immunity provisions of the Workmen's Compensation Act should therefore be held constitutional under Section 13. [emphasis by Justice Beatty]
 ". . . The Workmen's Compensation Act, as amended, clearly was intended to create a compensation system which would shift the financial burden of industrial accidents from the injured employee to the employer. See Pow v. Southern Construction Co., 235 Ala. 580, 180 So. 288 (1938). In short, our statute is based upon the principle of enterprise liability. . . . The Act is
an enterprise system; why not interpret it accordingly? . . . Through the unjustified imposition of the quid pro quo concept onto Section 13, this Court has found certain of the workmen's compensation immunity provisions unconstitutional due to inadequacy of the 'consideration' that passes under the Act between the immunized party and the injured covered employee. A contract would not, in the absence of special circumstances be held invalid for inadequacy of consideration (e.g., Colburn v. Mid-State Homes, Inc., 289 Ala. 255, 266 So.2d 865 (1972). Surely a legislative enactment should be entitled to at least the same dignity of treatment.
 ". . . Before Grantham the 'perceived social evil' criterion was not thought [to] be appropriate in the analysis of a statute under Section 13 of the Constitution. Because the majority now is presumably as committed to the 'perceived social evil' test as it is to the quid pro quo standard, a few words upon the Court's prior decisions dealing with the extent of the police power are in order.
 "The legislature's exercise of the police power to combat social evil or to attain social objectives has previously been upheld against Fourteenth Amendment challenges if the law enacted bore a reasonable relation to a proper legislative purpose and was neither arbitrary nor discriminatory. See e.g., Alabama Dairy Commission v. Food Giant, Inc., Ala., 357 So.2d 139 (1978).
 "Pickett v. Matthews, [238 Ala. 542, 192 So. 261
(1939)], viewed the legislative abolition of a common law cause of action to be a valid exercise of the police power 'when such abolition [was] to obtain a permissible social object.' [emphasis added by Justice Beatty] . . . If adhered to in this case, the Pickett standard would compel the conclusion that the immunity provisions of the Workmen's Compensation Act are constitutional enactments designated to provide for the general welfare.
 "The limitations upon the legislature's exercise of the police power are few; as was said in Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 13, 18 So.2d 810 (1944):
 " '[The police] power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation to the regulation and the ends to be *Page 112 
attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained.' [emphasis added by Justice Beatty]
 "Men may indeed reasonably differ upon whether these immunity provisions are rationally related to permissible state objectives; the widely divergent views of the members of this Court abundantly support that proposition. . . .
 "One firmly ingrained principle of jurisprudence which seems to have been overlooked inGrantham and its offspring is the presumption favoring constitutionality. Alabama State Federationof Labor v. McAdory, supra. In McAdory, after noting the plenary power that is vested in the legislature, it was pointed out at 246 Ala. at 9, 18 So.2d at 815:
 " '[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law.' "
We now examine the "Act," whose constitutionality has been challenged under § 13. Section 13 of the Act (now § 25-5-17, Code) provides:
 "The provisions of this act are expressly declared not to be severable. If any provision of this act shall be adjudged to be invalid by any court of competent jurisdiction, then this entire act shall be invalid and held for naught."
Other sections of the Act prohibited an employer from terminating an employee solely because the employee has instituted or maintained an action against the employer to recover worker's compensation benefits or has filed a written notice of a violation of a safety rule (Section 11, now §25-5-11.1); made the provisions applicable with respect to compensation for occupational diseases generally, occupational pneumoconiosis generally, pneumoconiosis of coal miners, and occupational exposure to radiation (Section 12, now § 25-5-16); provided for the appointment of a safety committee to advise the employer regarding safety in the work place (Section 10, now § 25-5-15); extended the statute of limitations from one year to two years (Section 9, now § 25-5-80); and authorized medical providers to release to the employee or employer upon request, without sending a copy to a non-requesting party, reports and professional opinions as to the extent of the employee's injury or disability (Section 8, now § 25-5-77).
The Act also, for injuries occurring after February 1, 1985, increased the minimum amount payable under the Act from 25% to 27 1/2% of the average weekly wage of the state as determined by the director of industrial relations and increased the maximum amount payable from 66 2/3% to 100% of such average weekly wage, but limited the maximum compensation payable forpermanent partial disability to the lesser of $220 per week or 100% of such average weekly wage. (Section 7, now § 25-5-68); modified § 25-5-57, to comply with the new statute of limitations (Section 6); limited the grounds for denial of compensation under the Act to willful refusal or willful neglect to perform a statutory duty or other willful violation or willful breach of law or reasonable regulation (Section 4, now § 25-5-51); and modified § 25-5-1(6) to include "worker, workmen" (Section 2).
Section 1 of the Act makes the following legislative finding:
 "The legislature finds that actions filed on behalf of injured employees against officers, directors, agents, servants or employees of the same employer seeking to recover damages in excess of amounts received or receivable from the employer under the workers' compensation statutes of this state and predicated upon claimed negligent or wanton conduct resulting in injuries arising out of and in the course of employment are contrary *Page 113 
to the intent of the legislature in adopting a comprehensive workers' compensation scheme and are producing a debilitating and adverse effect upon efforts to retain existing, and to attract new industry to this state. Specifically, the existence of such causes of action places this state at a serious disadvantage in comparison to the existing laws of other states with whom this state competes in seeking to attract and retain industrial operations which would provide better job opportunities and increased employment for people in this state. The existence of such causes of action, and the consequent litigation resulting therefrom, results in substantial costs and expenses to employers which, as a practical matter, must either procure additional liability insurance coverage for supervisory and management employees or fund the costs of defense, judgment or settlement from their own resources in order to retain competent and reliable personnel. The existence of such causes of action has a disruptive effect upon the relationship among employees and supervisory and management personnel. There is a total absence of any reliable evidence that the availability of such causes of action has resulted in any reduction of the number or severity of on-the-job accidents or of any substantial improvement on providing safe working conditions and work practices. The intent of the legislature is to provide complete immunity to employers and limited immunity to officers, directors, agents, servants or employees of the same employer and to the workers' compensation insurance carrier and compensation service companies of the employer or any officer, director, agent, servant or employee of such carrier or company and to labor unions and to any official or representative thereof, from civil liability for all causes of action except those based on willful conduct and such immunity is an essential aspect of the workers' compensation scheme. The legislature hereby expressly reaffirms its intent, as set forth in section 25-5-53, as amended herein, and sections 25-5-144 and 25-5-194, regarding the exclusivity of the rights and remedies of an injured employee, except as provided for herein."
§ 25-5-14.
In Section 3 of the Act (§ 25-5-11), the legislature limits an employee's claim for damages, where workmen's compensation benefits are payable, in actions against "a workers' compensation insurance carrier of the employer or any person, firm, association, trust, fund or corporation responsible for servicing and payment of workers' compensation claims for the employer, or any officer, director, agent, servant or employee of such carrier, person, firm, association, trust, fund or corporation, or . . . a labor union, or any official or representative thereof, or . . . an officer, director, agent, servant or employee of the same employer, or his personal representative," to actions in which willful conduct results in or proximately causes the injury or death. "Willful conduct" is specifically defined and will be discussed later in this opinion.
Section 5 of the Act (§ 25-5-53) provides:
 "The rights and remedies herein granted to an employee shall exclude all other rights and remedies of said employee, his personal representative, parent, dependents or next of kin, at common law, by statute or otherwise on account of said injury, loss of services or death. Except as provided in this article and article 2, as the case may be, of this chapter, no employer included within the terms of this chapter shall be held civilly liable for any personal injury to or death of any workman who is an employee of the employer and whose injury or death is due to an accident while engaged in the service or business of the employer, the cause of which accident originates in the employment. In addition, immunity from civil liability for all such causes of action except those based upon willful conduct shall also extend to any workers' compensation insurance carrier of the employer or any person, firm, association, trust, fund or corporation responsible for servicing and payment of workers' compensation claims for the employer *Page 114 
or any officer, director, agent, servant or employee of such carrier, person, firm, association, trust, fund or corporation and to any labor union, or any official or representative thereof, and to any officer, director, agent, servant or employee of the same employer, or his personal representative. Nothing in this section shall be construed to relieve any person from criminal prosecution for failure or neglect to perform any duty imposed by law.
 "For the purpose of this section, any carrier, person, firm, association, trust, fund or corporation shall include any company making a safety inspection on behalf of any self-insured employer or its employees and any officer, director, agent, servant or employee of such company."
After the Act became effective, plaintiff John Kenneth Reed suffered the injuries now sued upon. He elected to receive workmen's compensation benefits from his employer and then filed suit against the co-employees.
Does the Act pass constitutional muster under § 13?
 I. Vested Rights Approach
Historically, § 13 ("Every person, for any injury done him in his lands, goods, person, or reputation, shall have a tremedy
by due process of law . . ." (emphasis supplied)) was viewed to apply only in instances where a litigant had a vested interest in a particular cause of action. See Chapman v. Railway FuelCo., 212 Ala. 106, 101 So. 879 (1924); Mayo v. Rouselle Corp.,supra; Pickett v. Matthews, supra.
 "When a duty has been breached producing a legal claim for damages, such claimant cannot be denied the benefit of his claim for the absence of a remedy. But this provision does not undertake to preserve existing duties against legislative change made before the breach occurs. There can be no claim for damages to the person or property of anyone except as it follows from the breach of a legal duty."
Pickett, 238 Ala. at 545, 192 So. at 263.
Because Reed's injuries occurred after the Act became law, under the vested rights approach as espoused in Coosa RiverSteamboat Co. v. Barclay Henderson, supra; Peevey v.Cabaniss, supra; Chapman v. Railway Fuel Co., supra; Gentry v.Swann Chemical Co., supra; Pickett v. Matthews, supra; and Mayov. Rouselle Corp., supra, the Act passes constitutional muster with respect to Article I, § 13.[5] *Page 115 
 II. The "Common-law Rights Approach"
Justice Shores, in her opinion concurring in the result inFireman's Fund, with which Justice Almon concurred, set out the common-law rights approach to reviewing legislation under § 13:
 "Legislation which abolishes or alters a common-law cause of action, then, or its enforcement through legal process, is automatically suspect under § 13. It is not, however, automatically invalid. Grantham itself restates the established rule that such legislation will survive constitutional scrutiny if one of two conditions is satisfied:
 "1. The right is voluntarily relinquished by its possessor in exchange for equivalent benefits
or protection, or
 "2. The legislation eradicates or ameliorates a perceived social evil and is thus a valid exercise of the police power. [emphasis supplied]
 "I find it helpful to think of these alternatives as two different aspects of the quid pro quo concept: Thus, a right may be abolished if the individual possessor receives something in return for it (the individual quid pro quo dwelt upon in Grantham), or if society at large receives a benefit (thereby justifying exercise of the police power)."
394 So.2d at 352.
A plurality adopted this approach in Lankford, supra.[6]
Clearly, the remedy of proceeding against the tortious co-employee for personal injuries caused by negligence and wantonness and against the employer under the common law or an employer's liability act, or other statute, with its attendant uncertainties of amount and time, can be relinquished in exchange for the certainty of the remedy provided by the Workmen's Compensation Act for such personal injuries. For an injury done to him, the employee is choosing one means by which a violation of a right is prevented, redressed, or compensated for another means by which a violation of this right is prevented, redressed, or compensated.[7] There is a quid pro quo: remedy for remedy.
There is a mutuality of immunity. An employee relinquishes his right to sue his co-employee for negligence or wantonness in exchange for assurance that he will not be sued by his co-employee for negligence or wantonness. Jadosh v. Goeringer,442 Pa. 451, 275 A.2d 58 (1971), and Mier v. Staley, 28 Ill. App.3d 373, 329 N.E.2d 1 (1975), support this position.[8]
When considered in regard to the second condition enumerated by Justice Shores in *Page 116 Fireman's Fund, the Act also passes constitutional muster. Justice Beatty, dissenting in Fireman's Fund, wrote:
 "The limitations upon the legislature's exercise of the police power are few; as was said in Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 13, 18 So.2d 810 (1944):
 " '[The police] power must not be exercised arbitrarily or capriciously, and there must be some reasonable relation [between] the regulation and the ends to be attained. But if upon the matter men may reasonably differ, in view of all the circumstances, the legislative act in the exercise of the police power must be sustained.' " (emphasis added by Justice Beatty)
394 So.2d at 357.
The legislative findings and intent are set forth in § 25-5-14, Code. They are explicit. Justice Shores, concurring in the result in Fireman's Fund, poses the pertinent question: "Who is to determine if society at large receives a benefit by the deprivation of the common law remedy, the legislature or the courts?" See 394 So.2d at 352-53. All questions of "propriety, wisdom, necessity, utility, and expediency are held exclusively for the legislative bodies, and are matters with which the courts have no concern. This principle is embraced within the simple statement that the only question for the court to decideis one of power, not of expediency or wisdom." Alabama StateFederation of Labor v. McAdory, supra, 246 Ala. at 9-10,18 So.2d at 815.
This Court has held that the Legislature had the power to enact the guest statute and deprive a passenger of his common-law right to sue a host driver for negligence.Pickett v. Matthews, supra. This Court has also held that the Legislature had the power to abolish the common-law actions for alienation of affections and criminal conversation, after changing mores had rendered those causes of action obsolete or of no benefit to society. Henley v. Rockett, 243 Ala. 172,8 So.2d 852 (1942).
The Legislature has found that co-employee suits "are producing a debilitating and adverse effect upon efforts to retain existing, and to attract new industry to this state," that they "[place] this state at a serious disadvantage in comparison to . . . other states with whom this state competes in seeking to attract and retain industrial operations which would provide better job opportunities and increased employment for people in this state," and that they have "a disruptive effect upon the relationship among employees and supervisory and management personnel." Ala. Code (1975), 25-5-14 (1986 Repl.Vol.). It is certainly within the police power of the legislature to act to enhance the economic welfare of the citizens of this state by enhancing harmony in the work place. All questions of "propriety, wisdom, necessity, utility, and expediency" are exclusively for legislative determination.McAdory, 246 Ala. at 9, 18 So.2d at 815. The only question for the Court is whether the Legislature has the power to eliminate co-employee suits grounded in negligence or wantonness. We think that the Legislature does have the police power to eliminate such co-employee suits in an attempt to eradicate or ameliorate what it perceives to be a social evil.
Justice Beatty, dissenting in Fireman's Fund, wrote:
 "One firmly ingrained principle of jurisprudence which seems to have been overlooked in Grantham and its offspring is the presumption favoring constitutionality. Alabama State Federation of Labor v. McAdory, supra. In McAdory, after noting the plenary power that is vested in the legislature, it was pointed out at 246 Ala. at 9, 18 So.2d at 815:
 " '[I]n passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable *Page 117 
doubt that it is violative of the fundamental law.' "
394 So.2d at 357.
Therefore, whether tested by the traditional test of the vested rights approach or by either prong of the common-law rights approach, the Act is not violative of § 13 of the Alabama Constitution insofar as it abolishes suits against co-employees for negligence or wantonness.
Plaintiff next contends that the Act violates Art. IV, § 45, of the Alabama Constitution of 1901, which provides that each law shall have but one subject and that that subject shall be expressed in its title.
Plaintiff makes the following argument regarding the legislative findings and intent contained in Section 1 of the Act:
 "[The subject of the Act] is not limited to the grant of co-employee immunity. To the contrary, the Act involves several distinct subjects with the expressed intent of promoting industry and achieving complete employer immunity. See Ala. Code
§ 25-5-14.
 "Co-employee lawsuits involve a single subject. Liability insurance, workmen's compensation, [and] industry and employer immunity are also single subjects when considered separate and apart from the others. One single Act, however, encompassing each of these subjects does not constitute a single subject."
Appellant's brief, at 25-26.
The irony of plaintiff's contention that the existence of legislative findings that some members of this Court have indicated may be necessary for such an act to withstand scrutiny under § 13 of our Constitution makes the Act unconstitutional under § 45, is not missed by this Court. We do not play games with the Legislature, and we suggest that litigants not play games with this Court. The Legislature is elected to enact laws. When the constitutionality of an act of the Legislature is challenged, our standard of review is to sustain that act "unless it is clear beyond reasonable doubt that it is violative of the fundamental law." Alabama StateFederation of Labor v. McAdory, 246 Ala. at 9, 18 So.2d at 815.
It is obvious that the Act is a comprehensive amendment of Alabama's Workmen's Compensation Act and was adopted to modify various remedies available under that law. This is in keeping with this Court's opinion in Yeilding v. State ex rel.Wilkinson, 232 Ala. 292, 167 So. 580 (1936), and also with its opinion in Newberry v. City of Andalusia, 257 Ala. 49, 58,57 So.2d 629, 636 (1952), in which the Court wrote:
 "Many decisions of this Court support the proposition that a number of different branches of the same general subject may be included in one bill if they are all germane and cognate to and have a general connection with the one principal subject."
The Act encompasses the "one principal subject": amendment of specific sections of Alabama's Workmen's Compensation Act. The fact that the Legislature included in the Act its findings, which explain to this Court what "social evils" it was attempting to cure and control or what social objectives it was seeking to attain — which objectives have the effect of preserving, promoting, or benefiting the general welfare the Legislature attempts to promote by adapting the Act — does not make the Act have more than one subject so as to render it unconstitutional when tested by Art. IV, § 45, of the Constitution of 1901. Yeilding v. State ex rel. Wilkinson,supra; Newberry v. City of Andalusia, supra.
The Court of Criminal Appeals in Hilsabeck v. State,477 So.2d 465, 470 (Ala.Crim.App. 1984), affirmed, 477 So.2d 472
(Ala. 1985), wrote with some specificity as to the form and adequacy of titles to legislative enactments:
 "The form of an act's title is within the province of the legislature, so long as the subject is clearly expressed and the constitution is not offended. . . . The books are replete with cases in which § 45 challenges to acts' titles have been made. In Watkins v. State, 409 So.2d 901, 903
(Ala.Crim.App. 1981), this court stated that the constitution's clear expression of title requirement 'does not mean that the title is to be a complete index and detailed catalog of every clause, section or *Page 118 
provision in the act relating to its subject.'
 "The standard to be applied in considering the constitutionality of an act under § 45 is whether the title 'is so misleading and uncertain that the average legislator or person reading the same would not be informed of the purpose of the enactment.' . . . Similarly, § 45 'is not to be exactingly enforced in such a manner as to cripple legislation or to be enforced with hypercritical exactness, but is to be accorded a liberal interpretation.' "
If we were to adopt the plaintiff's contention, we would certainly be deviating from the standard that we have heretofore applied in considering the constitutionality of an act under Section 45, and we would be crippling legislation. This we decline to do. There is but one principal subject in the Act, and the title of the Act is not so uncertain or misleading that the average legislator or other person reading it would not be informed of the purpose of the enactment. There is no merit in this issue.
Plaintiff also contends that Ala. Code (1975), § 25-5-11
(Section 5 of the Act), violates the Constitution of the United States, specifically that it singles out "co-employee" plaintiffs as compared with most members of society in regard to available tort remedies and thereby violates the Equal Protection Clause of the Fourteenth Amendment. We disagree.
The plaintiff's argument overlooks the fact that the employee has a right to recover for injuries negligently or wantonly caused by a "co-employee," but not if he has previously elected (presuming he has the right to elect)[9] to accept the remedy provided for such injuries by the Alabama Workmen's Compensation Act.
Alternatively, it is clear that the classification of plaintiffs inherent in this statute is susceptible only to minimal scrutiny by the courts under the equal protection doctrine. It involves no suspect class, nor does it impinge upon a fundamental right.[10] Consequently, the "rational basis" test under the equal protection doctrine is to be applied, and the classification will be upheld if it is rationally related to a legitimate legislative purpose. E.g., Board of Trustees ofthe Policemen's Firemen's Retirement Fund v. Cardwell,400 So.2d 402 (Ala. 1981) (citing San Antonio School District v.Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)). *Page 119 
We think it beyond doubt that our previous discussion of the Legislature's purposes in adopting the Act demonstrates that the classification in question rationally relates to those purposes. This is classic economic and social welfare legislation, and it is a canon of modern constitutional law that such legislation will not be invalidated under the equal protection doctrine. See generally, 2 R. Rotunda, J. Nowak J. Young, Treatise on Constitutional Law: Substance Procedure § 18.3 (1986). Accordingly, Ala. Code (1975), § 25-5-11, does not violate the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States.
Having determined that the limited immunity granted to co-employees under § 25-5-11 is constitutional we conclude that there was no error in the trial court's granting these defendants' a summary judgment on the negligence and wantonness counts (counts two and three).
We must next determine whether there is sufficient evidence tending to show that the plaintiff was injured as a result of the defendants' "willful conduct," as that term is defined in § 25-5-11(c)(1) and (2). If there is not, the summary judgment was also proper as to count one.
Section 25-5-11(c)(1) and (2), in pertinent part, read as follows:
"(c) As used herein, 'willful conduct' means:
 "(1) A purpose or intent or design to injure another; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent and purpose of inflicting injury, then he is guilty of 'willful conduct.'
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from such removal; provided, however, removal of such a guard or device shall not be willful conduct unless such removal did, in fact, increase the danger of use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
Under § 25-5-11, an employee may be liable in damages for the death of, or injuries sustained by, a fellow employee; however, such liability can be based only on injury or death proximately caused by the offending employee's "willful conduct."
Section 25-5-11(c)(1) clearly defines "willful conduct" in terms of a "purpose or intent or design to injure another." The plaintiff need not show that the co-employee defendant specifically intended to injure the person who was injured. What must be shown, however, is that the co-employee defendant set out purposefully, intentionally, or by design to injuresomeone, and that his actions in furtherance of that purpose, intent, or design, resulted in, or proximately caused, the injury or death upon which suit was brought. In defining "willful conduct" in these terms, the Legislature recognized the clear distinction that has developed in Alabama between "wanton conduct" and "willful conduct":
 " 'Wantonness' is the conscious doing of some act or the omission of some duty under knowledge of existing conditions [while] conscious that from the doing of such act or omission of such duty injury will likely or probably result.
 " 'Wilfulness' is the conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury.
 "Therefore, in 'wanton conduct' and 'wanton injury' a purpose or intent or design to injure is not an ingredient; and where a person from his knowledge of existing conditions and circumstances is conscious that his conduct will probably result in injury, yet, with reckless indifference or disregard of the natural or probable consequences, but without having an intent or design to injure, he does the act, or fails to act, he would be guilty of wantonness, but not of wilfulness. *Page 120 
 "But, in 'wilful conduct' and 'wilful injury' a purpose or intent or design to injure is an ingredient; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he is guilty of wilfulness."
Alabama Pattern Jury Instructions: Civil 29.01 (1974). See, also, Birmingham Ry. Electric Co. v. Bowers, 110 Ala. 328,20 So. 345 (1895); Central of Georgia Ry. v. Corbitt, 218 Ala. 410,118 So. 755 (1928); Porterfield v. Life Casualty Co. ofTennessee, 242 Ala. 102, 5 So.2d 71 (1941); English v. Jacobs,263 Ala. 376, 82 So.2d 542 (1955); Burns v. Moore, 494 So.2d 4
(Ala. 1986).
The evidence in this case, when considered in a light most favorable to the plaintiff, tends to show that the plaintiff, as well as some of his co-workers, had been instructed by defendant Howell to work on and around the mixer while it was in operation. There is also evidence tending to show that a guard that had shielded the front of the mixer's drive wheel had been removed during repairs some time prior to the plaintiff's injury and had not been replaced and that the co-employees had taken no steps prior to the plaintiff's injury to install guards on each side of the drive wheel in order to shield the nip-point. Although this evidence does tend to show that the defendants were negligent, or perhaps even wanton, in their conduct toward the plaintiff, it fails to show that any of the co-employees set out purposefully, intentionally, or by design to injure anyone. In other words, there is no evidence tending to show the existence of a state of mind on the part of the co-employees above and beyond that required to establish negligence or wantonness. See Lynn Strickland Sales Service,Inc. v. Aero-Land Fabricators, Inc., 510 So.2d 142 (Ala. 1987). Although intent is a matter peculiarly within the province of the jury and may usually be shown by any condition or circumstance from which it may be reasonably inferred, Walkerv. Woodall, 288 Ala. 510, 262 So.2d 756 (1972), we do not think the Legislature contemplated that "willful conduct," as defined in the statute, would be reasonably inferable from evidence such as that introduced in this case.
In § 25-5-14 the Legislature expressed concern over the rising costs of litigation among co-employees, as well as the disruptive effect that such litigation can have on workers. That concern indicates to us that the Legislature intended for an injured plaintiff to prove more than simply that he was compelled to work under circumstances that posed a foreseeable risk of harm to him or others (or circumstances from which harm could likely or even probably result), in order to maintain his action based on the "willfulness" of a co-employee defendant. To the contrary, we believe the Legislature sought to insure that these kinds of cases would not be submitted to a jury without at least some evidence tending to show either 1) the reason why the co-employee defendant would want to intentionally injure the plaintiff, or someone else, or 2) that a reasonable man in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his actions. (A purpose, intent, or design to injure another was not intended to be reasonably inferable from evidence showing only knowledge and appreciation of a risk of injury or death short of substantial certainty that injury or death would occur.) We think it safe to say that negligent, or even wanton, conduct is much more prevalent in the work place than conduct actually intended to cause injury or death. We think the Legislature has recognized this also, and, in so doing, has placed upon an injured worker a heavier burden in proving a purpose, intent, or design to injure on the part of a co-worker. This comports with the manifest intent of the Legislature that litigation among co-employees be restricted to those situations in which the plaintiff can show something more than what is usually sufficient to make out a case of negligence or wantonness. There is no evidence in this case tending to show that any of the defendants had a reason to injure the plaintiff, or anyone else; nor is there any evidence tending to show that the plaintiff's *Page 121 
injury was substantially certain to follow from the actions of the defendants. Therefore, the plaintiff has failed to make out a prima facie case of "willfulness" as defined in §25-5-11(c)(1).
The plaintiff argues, under § 25-5-11(c)(2), that the defendants willfully and intentionally removed a guard from the mixer that shielded the front of the drive wheel. As previously stated, there is evidence tending to show that such a guard had been removed from the mixer at some point prior to the plaintiff's injury. However, that guard did not shield the nip-point in which the plaintiff caught his hand. It appears undisputed in the record that at the time the mixer was installed at Faulkner Concrete Pipe Company, it was not equipped with side guards shielding the nip-point. Therefore, there is no evidence that the plaintiff's injury was proximately caused by the defendants' removal of a safety guard or device that had been provided by the manufacturer of the mixer.
The trial court properly granted the summary judgment in favor of the co-employee defendants on all counts. That judgment is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, BEATTY and STEAGALL, JJ., concur.
JONES, J., concurs in the result, with opinion.
ALMON, SHORES and ADAMS, JJ., concur in the result.
[1] Rene Reed claimed damages for loss of consortium; therefore, because her claim is merely derivative of her husband's, all references in the opinion to the plaintiff are to John Kenneth Reed.
[2] The judgment in favor of the co-employees was certified final pursuant to Rule 54(b), Ala.R.Civ.P.
[3] The plaintiff testified that he was specifically instructed also to clean underneath the drive wheel. Howell testified that he told the plaintiff not to clean near the mixer. There is testimony to the effect that the plaintiff, as well as some of his co-workers, had previously been instructed by Howell to work on top of and around the mixer while it was in operation.
[4] Howell testified that prior to the accident he had instructed the plaintiff not to use the air powered chipping gun. The plaintiff testified that Howell simply did not tell him to use the gun, but that it was normal to use one to clean up hardened concrete.
[5] We note that the following argument has been advanced:
 "While this approach [the vested rights approach] certainly provides maximum latitude to the legislature and continues to be followed, most recently in Mayo v. Rouselle Corp., supra, it is not apparent that this provides any more protection to an injured individual than an ex post facto clause. It can be said to express a positivist theory of jurisprudence, a notion that there are no rights other than those provided by the legislature. But if this were all that § 13 guaranteed, there would be no need for its inclusion in the constitution; Art. I, § 22, prohibits ex post facto bills."
Fireman's Fund, 394 So.2d at 351-52.
However, the prohibition of § 22 against the passage by the legislature of ex post facto laws applies only to criminal cases. Calder v. Bull, 3 Dall. 386, 1 L.Ed. 648 (1798);Aldridge v. Tuscumbia, etc., R.R., 2 Stew. Port. 199 (Ala. 1832); Bloodgood v. Cammack, 5 Stew. Port. 276 (Ala. 1834);Elliott v. Mayfield, 4 Ala. 417 (1842); State ex rel. Brassellv. Teasley, 194 Ala. 574, 69 So. 723 (1915); Ward v.State, 42 Ala. App. 529, 170 So.2d 500 (1964), cert. denied,277 Ala. 703, 170 So.2d 504 (1965); 16A C.J.S., Constitutional Law
§ 409, 412 (1984). Likewise, § 95 of the Constitution prohibits the Legislature from the following: "After suit has been commenced on any cause of action, the legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit." (emphasis supplied) There is a need for the inclusion of § 13 as interpreted under the vested rights approach.
 "When a duty has been breached producing a legal claim for damages, such claimant cannot be denied the benefit of his claim for the absence of a remedy."
Pickett, 238 Ala. 545, 192 So. at 263.
Section 13 protects the injured party's right to a remedy from the time the civil action accrues until suit is filed, which is not protected from legislative action under either § 22 or § 95 of the Constitution. The need for the last sentence of § 95 may be questionable under any interpretation of § 13 as to common-law causes of action or defenses heretofore advanced by the Court; however, it is referred to herein to showthat there is a need for § 13's inclusion in the Constitution under the vested rights approach.
[6] To give deference to the words used by the framers of the Alabama Constitution, the first condition could be more correctly stated as: The remedy is voluntarily relinquished by its possessor in exchange for equivalent benefits or protection, since the word "right" does not appear in § 13 but the word "remedy" does. Black's Law Dictionary, (5th ed. 1979) defines the word "remedy," which appears in the constitutional provision: "means by which a right is enforced or violation of a right is prevented, redressed, or compensated. Long LeafLumber, Inc. v. Svolos, La. App., 258 So.2d 121, 124. The means employed to enforce a right or redress an injury, as distinguished from right, which is a well founded or acknowledged claim. Chelentis v. Luckenbach S.S. Co.,247 U.S. 372, 38 S.Ct. 501, 503, 62 L.Ed. 1171."
[7] In Pipkin v. Southern Elec. Pipefitting Co., 358 So.2d 1015,1016 (Ala. 1978), the Court specifically noted that the 1973 amendments to the Alabama Workmen's Compensation Act "in no way affected the elective option between employer and employee existing under the Act as heretofore defined." The question as to whether the Pipkin Court erred in this determination is not squarely before us in the present case. However, for purposes of testing the constitutionality of the Act in question in this case under the first prong of the common law rights approach, we will presume that the conclusion reached by the Court inPipkin was the correct one.
[8] Justice Jones, in his opinion concurring in the result inFireman's Fund, does not interpret these cases as so holding. "These Courts simply look to the employer's obligation as an element within the total, overall statutory scheme and find sufficient offsetting benefits and obligations to constitutionally justify the co-employee immunity."394 So.2d at 343.
[9] See note 7.
[10] The plaintiff argues that the Act impinges on a right to a trial by jury guaranteed to him by the Constitution of Alabama and by the Seventh Amendment of the Federal Constitution, and that such an impingement requires strict scrutiny of the statutory provision under the Equal Protection Clause of theFederal Constitution. Plaintiff misperceives the law.
First of all, the "fundamental rights" that have been recognized by the United States Supreme Court as requiring increased judicial scrutiny are limited to those rights "explicitly or implicitly guaranteed by the [Federal] Constitution." San Antonio Independent School District v.Rodriguez, 411 U.S. 1, 33-34 [93 S.Ct. 1278, 1297,36 L.Ed.2d 16] (1973). Accordingly, as the Equal Protection Clause is now interpreted, courts may not properly look to rights established by state constitutions under the federal equal protection doctrine in determining the quality of judicial scrutiny. Thus, strict scrutiny is not invoked under the Equal Protection Clause of the Fourteenth Amendment on the basis of rights established under a state constitution. But see M. Morgan,Fundamental State Rights: A New Basis for Strict Scrutiny inFederal Equal Protection Review, 17 Ga.L.Rev. 77 (1982) (arguing that the contrary approach ought to be taken).
Second, the Seventh Amendment right to a trial by jury in civil cases has been explicitly held to beinapplicable to the states. Minneapolis St. Louis R.R. v.Bombolis, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916). Thus, unlike most of the other protections of the Bill of Rights, which have been incorporated via the Fourteenth Amendment so as to apply to the states, the "right" to a civil jury trial is not a "fundamental right" for the purposes of equal protection review, at least in the context of state legislation affecting state trials. See 2 R. Rotunda, J. Nowak J. Young, Treatise on Constitutional Law: Substance Procedure § 18.42 (1986) (by implication). Cf. Finance, Inv. Rediscount Co. v. Wells, 409 So.2d 1341 (Ala. 1981) (on rehearing); U-Haul Co. v. State, 294 Ala. 330, 316 So.2d 685
(1975).
Consequently, we view the "rights" advanced by plaintiff as not being among those rights the United States Supreme Court has declared to be "fundamental" for purposes of review under the federal equal protection doctrine.