The plaintiffs, Albert Charles Lee, Jr., and his wife, Karen Lee, appeal from the *Page 901 
summary judgment entered in favor of the defendants, Rick Ledsinger, Dick Robinson, and Perry Ellison, Jr., in this action to recover damages based on personal injury to Mr. Lee. The action was brought under Ala. Code 1975, § 25-5-11 (part of the Alabama Workmen's Compensation Act).[1] We affirm.
Summary judgment was proper in this case if there was no genuine issue of material fact and the defendants were entitled to a judgment as a matter of law. Rule 56, A.R.Civ.P. The burden was on the defendants to make a prima facie showing that no genuine issue of material fact existed and that they were entitled to a judgment as a matter of law. If that showing was made, then the burden shifted to the plaintiffs to present evidence creating a genuine issue of material fact, so as to avoid the entry of a judgment against them. In determining whether there was a genuine issue of material fact, this Court must view the evidence in the light most favorable to the plaintiffs and must resolve all reasonable doubts against the defendants. Wakefield v. State Farm Mutual Automobile Ins. Co.,572 So.2d 1220 (Ala. 1990). Because this action was not pending on June 11, 1987, the applicable standard of review is the "substantial evidence" rule. Ala. Code 1975, § 12-21-12. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida,547 So.2d 870, 871 (Ala. 1989).
The evidence, viewed in the light most favorable to the plaintiffs, shows the following: Albert Charles Lee, Jr., who had a history of neck and back problems, which included two operations, had been an employee of Dunlop Tire Corporation at its rubber processing and tire manufacturing plant in Madison County for approximately 12 years when, on June 24, 1988, he suffered two ruptured disks in his neck while lifting and pulling a metal pallet that was used to transport "mixed rubber" from the "mixer" to a conveying system for further processing. Lee, who had transferred to Department 701, "A" shift, in March 1988, used a forklift to carry the pallet, which weighed approximately 130 to 135 pounds, from the "mixer" to the conveyor. However, pursuant to a procedure that had been officially instituted in Department 701 in 1987, Lee was required to manually position the pallet on the conveyor. That procedure had been implemented by Ellison, who was Lee's shift supervisor; it had been instituted by Robinson, who was Ellison's supervisor. Ledsinger was the plant's production manager and Robinson's supervisor. Lee was injured as he was manually lifting and pulling the pallet into position on the conveyor.
A great deal of discussion between the plant's managers and supervisors, which included the defendants, and representatives of Lee's union had taken place on June 23, the day before Lee's injury, and on the morning of June 24, prior to Lee's injury, concerning the propriety of the plant's procedure requiring the manual positioning of the pallets on the conveyor in Department 701. That procedure was applicable to all of the forklift operators in Department 701 whose jobs were to transport rubber from the "mixer" to the conveyor, and the discussion between the plant's managers and supervisors and the representatives of the union was the result of complaints that had been made by Lee on June 23 and 24, and by a number of other forklift operators. Those complaints stemmed from the fact that the procedure that had been instituted in 1987, requiring the manual positioning of the pallets, had not been enforced for a period of time, resulting in the fact that the forklift operators in Department 701 had been allowed to follow a different procedure for positioning the pallets on the conveyor with the forklifts. Lee had transferred to Department 701 in March 1988, during the period when employees were being allowed to use this *Page 902 
alternative procedure. However, enforcement of the procedure that had been instituted in 1987 was commenced again on June 23, 1988, out of concern that the procedure of allowing the use of the forklifts to position the pallets was damaging the equipment.
The defendants were generally aware when Lee transferred to Department 701 in March 1988, that he had a history of neck and back problems. In fact, Robinson had been concerned that Lee might not be physically capable of doing the job. At that time, however, Lee was under no restrictions as to the amount of weight that he could lift; but, after working for several months and after experiencing discomfort in his neck and back, Lee had seen his doctor on June 21, 1988, and the doctor had told him not to lift more than 50 pounds. When the procedure for positioning the pallets manually went into effect again on June 23, Lee informed Ellison that he had been restricted by his doctor to lifting no more than 50 pounds. Ellison told Lee that the procedure for positioning the pallets with the forklifts had been changed on orders from "upstairs" and that Lee had to manually position the pallets. It was at that point that Lee, and the other forklift operators, began to complain. By the end of the day on June 23, Ledsinger and Robinson had also been told of the weight restrictions that had been placed on Lee by his doctor. The procedure requiring the manual positioning of the pallets was officially changed on June 24, within approximately 24 hours of the initial complaints. In fact, at the time Lee was injured on the morning of June 24, the decision had already been made by Ledsinger to have the forklift operators in Department 701 return to the procedure of using forklifts to position the pallets on the conveyor. Unfortunately, that decision had not been communicated to Ellison.
The substance of the plaintiffs' complaint charges the defendants with "willful conduct" with the intent to injure, under § 25-5-11(c)(1), supra. In Reed v. Brunson,527 So.2d 102, 119-20 (Ala. 1988), this Court set out what constitutes "willful conduct":
"Section 25-5-11(c)(1) . . . reads as follows:
" '(c) As used herein, "willful conduct" means:
 " '(1) A purpose or intent or design to injure another; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent and purpose of inflicting injury, then he is guilty of "willful conduct."
" '. . . .
 "Under § 25-5-11, an employee may be liable in damages for the death of, or injuries sustained by, a fellow employee; however, such liability can be based only on injury or death proximately caused by the offending employee's 'willful conduct.'
 "Section 25-5-11(c)(1) clearly defines 'willful conduct' in terms of a 'purpose or intent or design to injure another.' The plaintiff need not show that the co-employee defendant specifically intended to injure the person who was injured. What must be shown, however, is that the co-employee defendant set out purposefully, intentionally, or by design to injure someone, and that his actions in furtherance of that purpose, intent, or design, resulted in, or proximately caused, the injury or death upon which suit was brought. In defining 'willful conduct' in these terms, the Legislature recognized the clear distinction that has developed in Alabama between 'wanton conduct' and 'willful conduct':
 " ' "Wantonness" is the conscious doing of some act or the omission of some duty under knowledge of existing conditions [while] conscious that from the doing of such act or omission of such duty, injury will likely or probably result.
 " ' "Willfulness" is the conscious doing of some act or omission of some duty under knowledge of existing conditions accompanied with a design or purpose to inflict injury.
 " 'Therefore, in "wanton conduct" and "wanton injury" a purpose or intent or design to injure is not an ingredient; *Page 903 
and where a person from his knowledge of existing conditions and circumstances is conscious that his conduct will probably result in injury, yet, with reckless indifference or disregard of the natural or probable consequences, but without having an intent or design to injure, he does the act, or fails to act, he would be guilty of wantonness, but not of willfulness.
 " 'But, in "willful conduct" and "willful injury" a purpose or intent or design to injure is an ingredient; and where a person, with knowledge of the danger or peril to another consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he is guilty of willfulness.'
 "Alabama Pattern Jury Instructions: Civil 29.01 (1974). See, also, Birmingham Ry. Electric Co. v. Bowers, 110 Ala. 328, 20 So. 345 (1895); Central of Georgia Ry. v. Corbitt, 218 Ala. 410, 118 So. 755
(1928); Porterfield v. Life Casualty Co. of Tennessee, 242 Ala. 102, 5 So.2d 71 (1941); English v. Jacobs, 263 Ala. 376, 82 So.2d 542 (1955); Burns v. Moore, 494 So.2d 4 (Ala. 1986)."
The evidence in this case, when considered in the light most favorable to the plaintiffs, shows that Lee and certain other forklift operators in Department 701 of the Dunlop plant were required for approximately a day and a half (June 23 and part of June 24, 1988) to follow the procedure that had been officially instituted in 1987, but that had not been enforced for a period of time, that required them to lift and pull heavy metal pallets. The evidence also shows that the defendants were generally aware of Lee's history of neck and back problems when he transferred to Department 701 in March 1988, but that they did not learn of the weight restrictions that had been placed on him by his doctor until June 23, when Lee and the other forklift operators began to complain. The decision to return to the procedure of positioning the pallets with the forklifts was made within approximately 24 hours of the initial complaints; however, that decision did not reach Lee's shift supervisor until after Lee had injured his neck. Although we might agree that this evidence shows that the defendants were negligent, or perhaps even wanton, in their conduct toward Lee, it falls short of showing that the defendants set out purposefully, intentionally, or by design to injure Lee, or anyone else. In other words, we view the evidence as being insufficient to show the existence of a state of mind on the part of any of the defendants above and beyond that required to establish negligence or wantonness. See Reed v. Brunson, supra; see, also, Lynn Strickland Sales Service, Inc. v. Aero-LaneFabricators, Inc., 510 So.2d 142 (Ala. 1987).
While we recognize that intent is a matter peculiarly within the province of the jury and that it may be shown by any condition or circumstance from which it may be reasonably inferred, see Walker v. Woodall, 288 Ala. 510, 262 So.2d 756
(1972), we do not think that "willful conduct," as that term is defined in the statute, can be reasonably inferred from evidence like that introduced in this case. See Reed v.Brunson, supra; see, also, Williams v. Price, 564 So.2d 408
(Ala. 1990). It was not intended that a purpose, intent, or design to injure another be reasonably inferable from evidence showing only knowledge and appreciation of a risk of injury or death and not showing a substantial certainty that injury or death would occur.
A careful reading of the Workmen's Compensation Act reveals that the Act was promulgated to ensure that cases where a plaintiff was compelled to work under circumstances that posed foreseeable risks of harm to himself or others or under circumstances from which harm could likely or even probably would result would not be submitted to a jury without evidence sufficient to show either 1) the reason why the co-employee defendant would want to intentionally injure the plaintiff, or 2) that a reasonable man in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his action. See Reed v.Brunson; see, also, Williams v. Price, supra. *Page 904 
After carefully reviewing the record in this case, we conclude that the evidence, when considered in its entirety, fails to show that any of the defendants had a reason to injure Lee or anyone else, or that any of the defendants should have known that it was substantially certain that Lee would suffer ruptured disks in his neck before the procedure requiring the manual positioning of the pallets could be changed. The tendencies of the evidence in this case were perhaps best summed up by Lee in his deposition:
 "Q. Now, in this lawsuit against Rick Ledsinger[, Dick Robinson, and Perry Ellison], you claim that they are responsible for the injury that [was] received by you. Tell me in your own words what complaint you have against those three individuals[.]
 "A. As far as complaints against the men [themselves], I have no personal conflict with them, as far as — I think they are two [sic] fine men just trying to do their job. But I feel like I was misjustly used in the fact that I voiced my opinion of letting them know of my restrictions and moving these skids was causing me some difficulty. And I feel like . . . they ignored it.
 "I felt like the communication [at] Dunlop was slow and inefficient to where there was a decision supposedly made on the 23rd to the 24th [but] . . . there was no communication whatsoever with supervision on the floor.
 "I feel like . . . Perry Ellison was probably the scapegoat or the go-between.
 "And other than that I just feel like they have — as far as the men, I have no complaints as far as they handled their business. I think they misused and misjudged.
 "Q. So as I understand it, one complaint you have is the communication [process] . . . at Dunlop was slow and inefficient in your case?
"A. Yes.
 "Q. Do you feel that the slowness of the communication process was the cause of the work that you were doing on the 24th [and] your subsequent injury?
"A. Correct.
 "Q. Do you feel like any of the three men you are suing in this lawsuit intentionally tried to cause you to injure yourself on the 24th?
". . . .
 "A. I don't think that Rick or Dick or Perry Ellison none of them would intentionally hurt or harm anybody."
Because the plaintiffs failed to rebut the defendants' prima facie showing of a lack of "willfulness," as that term is defined in § 25-5-11(c)(1), the defendants were entitled to a judgment as a matter of law and the trial court, therefore, properly entered the summary judgment.
AFFIRMED.
HORNSBY, C.J., and MADDOX, SHORES and STEAGALL, JJ., concur.
ALMON and ADAMS, JJ., concur in the result.
KENNEDY, J., dissents.
[1] Lee is presently receiving benefits under the Workmen's Compensation Act. Karen Lee filed a derivative claim for loss of consortium.