Harry **ROMMELL** and Jean **Rommell,**
Plaintiffs–Appellants,

v.

**AUTOMOBILE RACING CLUB OF AMERICA, INC.,** a corporation; Alabama International Motor Speedway, a corporation; International Speedway Corporation, Wildcat Custom Vans, Inc., Jimmy Human, Bill Scott, Wayne Smith, Bruce Beauchamp, and Induction Systems, Inc., Defendants–Appellees.

No. 91–7060.

United States Court of Appeals,
Eleventh Circuit.

July 6, 1992.

Eugene P. Stutts, Spain, Gillon, Grooms, Blan & Nettles, James A. Kee, Jr., Birmingham, Ala., for plaintiffs-appellants.

Morris W. Richardson, Henry E. Simpson, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendants-appellees.

J. Bentley Owens, III, Starnes & Atchison, Birmingham, Ala., for Induction Systems, Inc.

Before ANDERSON, Circuit Judge, CLARK *, Senior Circuit Judge, and BROWN **, Senior District Judge.

WESLEY E. BROWN, Senior District Judge:

Plaintiff Harry Rommell was injured while working in a pit crew during an "ARCA 500" auto race at the Alabama International Motor Speedway, (Speedway), in Talladega, Alabama, on May 2, 1987. The race was sanctioned, governed and administered by the Automobile Racing Club of America (ARCA). Rommell was a volunteer member of a crew that serviced Car No. 53, owned by defendant Jimmy Human, (Wildcat Custom Vans) which was being driven by defendant Bill Scott.

Plaintiff was serving as a "catch-can" man, responsible for catching overflow gas when the race car was being fueled in the pit. The nozzle on a gasoline filler can failed to close causing fuel to be sprayed onto Rommell and the car. The gasoline hit the exhaust, or the car backfired, and an explosion and fire followed.

Plaintiff brought this action against ARCA, Speedway, Scott and Human, and two other members of the pit crew, defendants Wayne Smith and Bruce Beauchamp, alleging that their negligent and wanton conduct caused his injuries. Induction Systems, Inc., (Induction) the manufacturer of the gas nozzle that allegedly failed was also joined as a defendant, and alleged to be liable for negligence, wanton conduct, and breach of warranties.

The district court entered summary judgment in favor of the various defendants on all of plaintiff's claims. Allegations of negligence were dismissed on the basis of several releases signed by the plaintiff prior to the accident and upon a finding that plaintiff's assertion that he did not understand the effect of the releases was not sufficient to raise any question as to the validity of the releases. The claim based upon the alleged wanton conduct of defendant ARCA for failing to require race participants to wear fire protective clothing was found insufficient.[1] The district court granted the motion of Induction System for summary judgment upon plaintiff's claims for negligence, wantonness, and a claim under the Alabama Extended Manufacturers Liability Doctrine (AEMLD) on the ground that these claims were barred by Alabama's two-year statute of limitations.[2] Summary judgment was also granted in favor of Induction upon plaintiff's claim for breach of warranties, upon the ground that these claims were also barred by the statute of limitations, since the alleged faulty nozzle was "equipment" and not "consumer goods".

In this appeal, plaintiff claims that the trial court erred in granting summary judgment in favor of the ARCA defendants since there are genuine issues of material fact concerning the claims of wantonness as to these defendants. Plaintiff also claims that the court erred in finding, as a matter of law, that the releases barred all claims except for wantonness, and that it was error to find that the gasoline filler nozzle distributed by defendant Induction was "equipment" and not a "consumer good" under the Alabama Commercial Code.

Rule 56(c), Fed.R.Civ.Proc., provides that summary judgment is proper "if the pleadings, depositions, answers to interrogato-

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Wesley E. Brown, Senior U.S. District Judge for the District of Kansas, sitting by designation.

1. The claim of plaintiff's wife for loss of consortium was found to be precluded by the failure of plaintiff's claims.

2. This ruling has not been appealed.

ries and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), relating to the use of affidavits, does not require that the moving party's motion always be supported by affidavits to show the absence of disputed material facts. "Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 276 (1986).

We independently review the summary judgment order, upon the record, to determine whether any genuine issue of material fact exists. If there are material factual disputes, or if reasonable minds might differ on the inferences arising from undisputed facts, then summary judgment would be improper. See *Hinesville Bank v. Pony Exp. Courier Corp.* 868 F.2d 1532 (11th Cir.1989)

After a review of the record, for the reasons hereinafter set forth, we affirm the trial court's judgment on all claims based upon negligence and wanton conduct, but reverse the court on the warranty issue.

## FACTS

Defendant Bill Scott, the driver of car No. 53, had been involved in racing for about 20 years and had actually built and owned the car and raced it for himself until 1982 when he sold a half interest to defendant Wayne Smith. In 1984 he sold all of his interest to Smith, but he continued to drive the car for Smith at Talladega, Dayton, Pocono, Atlanta and in Michigan. In all he had participated as a driver in about 250 races, 8 to 10 of those at Talladega.

Prior to the accident, Scott had made one pit stop and the car had been refueled without a problem. The fire occurred during a second, unscheduled pit stop to check a mechanical problem. At the time of the fire, Scott was wearing a Nomex fireproof suit, fireproof underwear, socks and helmet liner. Since he was not wearing gloves at the time, he sustained some superficial burns on his hands.

Defendant Wayne Smith had an ownership interest in Car No. 53 from 1980–81 until April, 1987 when he sold it to defendant Jimmy Human. Smith had been involved in racing since the 1960's and had been a driver and worked in pit crews for many years, participating in about 50 ARCA races during that time. He was the one who had designated Scott as the driver of Car No. 53 and, on the day of the race, he was acting as the "crew chief" for Car No. 53. Smith and Scott recruited volunteers to work the pit during the Saturday race. Among these volunteers were plaintiff, defendant Bruce Beauchamp, and four men from Lake Speed's crew. It was a common practice to recruit volunteers from other crews who would not be racing until Sunday, since many enjoyed the work and wanted opportunities to practice their various specialties.[3] At the time of the explosion and fire, Smith was under the hood, working on the motor, and he was able to help Scott escape from the car without serious injury.

Defendant Jimmy Human the owner of Car No. 53, was the only "novice" at the pit that day. As noted, he had owned the car for less than a month and had never participated in racing at all prior to May 2, 1987. He designated Wayne Smith "to look after everything," and explained that he bought the car just because of "racing fever"—he "just wanted to try that, to try something new." During the race, he kept notes on the laps and did not actively work with the crew.

Defendant Bruce Beauchamp, age 24, had built and raced his own car on short

---

**3.** The Sunday event, a longer race, which involved different cars and drivers, was separately sponsored by another organization, the "NASCAR".

tracks in 1982 and 1983 when he was in college. He worked for Mark Stahl of North Carolina, who owned, drove and built Winston Cup stock cars and worked in a pit crew for the first time in May, 1985 at a NASCAR race—"The World 600"—for Mark Stahl and his car. He had participated as a pit man in 15 to 20 races, where he mostly acted as the "gas man," responsible for filling the tanks of race cars in the pit. He was at the Talladega track with Mark Stahl's crew, getting ready for Mark's race on Sunday. At the request of Stahl's crew chief, he agreed to help out with Scott's Car No. 53 during the Saturday race and did so because he enjoyed the work. He was a volunteer and was not paid for working in the pit. He did not know and had never met the plaintiff Harry Rommell before that time. He worked with Rommell, who acted as the "catch can" man. The fuel tank has a small hose that runs out the left rear end of the car and, when the tank is full, the fuel overflows and runs out of this hose. There was no automatic shut off when the tank was full and the only way the fuel man knows that the tank is full is to see fuel coming out of the overflow hose. Rommell's job was to catch this overflow of fuel when the tank was full.

An experienced fuel man can empty one 11–gallon can of fuel into a race car in 7 to 8 seconds.[4] As noted, Scott's car was refueled without incident during the first pit stop of the day. At the second pit stop, Beauchamp "dumped" the first fuel can without trouble, but the filler nozzle, known as a "Redhead," did not seal well when he tried to empty the second can. When he pulled the nozzle out of the fuel tank of the car, the automatic shut-off mechanism failed, he and Rommell were

sprayed with fuel, and the explosion and fire followed.[5] Beauchamp was not seriously burned in the accident.[6]

At the time of the accident, plaintiff had been involved in racing for about 39 years and had been self employed for 25 years. He became interested in auto racing at the age of 12 or 13 and attended races all over Wisconsin in the early 1950's. He started driving race cars in the mid 1950's and drove two seasons in Hawaii while in the marines. He had worked as a pitman for many years, some of those years in Nashville, and he had been working at the Talladega track for about 20 years, working part of the time as a catch-can man. He also had worked at tracks in Atlanta, Charlotte, and in Michigan. All of his work at various tracks was on a volunteer basis, without pay, because he enjoyed the sport.

Anyone who wishes to participate as a pit crew member in an ARCA race must have an annual ARCA license and a pit permit. In obtaining the license, an application must be completed and a fee paid. A new license is required for each racing year, and a new pit permit is required for each race. On March 28, 1987, plaintiff applied for his 1987 membership in ARCA and paid his membership dues. At that time he executed a "Release and Waiver of Liability and Indemnity Agreement," which contained the following provisions:

THIS SECTION MUST BE CAREFULLY READ AND SIGNED BY THE APPLICANT

IN CONSIDERATION of being permitted to enter for any purpose any Restricted Area (herein defined as including but not limited to the racing surface, pit areas, infield, burn out area, approach area, shut down area and all walkways,

4. Each pit has two 11–gallon "dump cans" which are filled with gasoline at a fuel depot, after the race starts. The nozzles for these cans, known as "Redheads," which are separate and apart from the cans, remain in the pit. The Redheads are clamped onto the cans after they have been filled and returned to the pit.

5. The nozzle was a part of the refueling system called a "dry brake system". The nozzle was actually a probe attached to the fuel can, with a spring loaded closing mechanism which, when

inserted into the gas tank of the race car, opened to let the gas flow into the tank. When the nozzle was removed, the mechanism was so designed to close automatically to prevent gas spillage.

6. Four other men from "Lake Speed's crew" were working as volunteer members of Scott's pit crew at the time of the accident. Two were tire changers, one was a "jack man," and the other a "tire carrier."

concessions and other areas appurtenant to any area where any activity related to the event shall take place), or being permitted to compete, officiate, observe, work for, or for any purpose participate in any way in the event, EACH OF THE UNDERSIGNED, for himself/herself, his/her personal representatives, heirs, and next of kin, acknowledges, agrees and represents that he has, or will immediately upon entering any such restricted areas, and will continuously thereafter, inspect such restricted areas and all portions thereof which he enters and with which he comes in contact, and he does further warrant that his entry upon such restricted area or areas and his participation, if any, in the event constitutes an acknowledgment that he has inspected such restricted area and that he finds and accepts the same as being safe and reasonably suited for the purposes of his use, and he further agrees and warrants that if at any time, he is in or about the restricted areas and he feels anything to be unsafe, he will immediately advise the officials of such and will leave the restricted areas:

1. HEREBY RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoter, participants, racing association, sanctioning organization or any subdivision thereof, track operator, track owner, officials, car owners, drivers, pit crews, any persons in any restricted area, promoters, sponsors, advertisers, owners and lessees of premises used to conduct the event and each of them, their officers and employees, all for the purpose herein referred to as "releasees," from all liability to the undersigned, his personal representatives, assigns, heirs, and next of kin for any and all loss or damage, and any claims or demands therefore on account of injury to the person or property or resulting in death of the undersigned, whether caused by the negligence of the releasees or otherwise while the undersigned is in or upon the restricted area and/or competing, officiating in, observing, working

for, or for any purpose participating in the event.

\*     \*     \*     \*     \*     \*

3. HEREBY ASSUMES FULL RESPONSIBILITY FOR AND RISK OF BODILY INJURY, DEATH OR PROPERTY DAMAGE due to the negligence of releasees or otherwise while in or upon the restricted area and/or while competing, officiating, observing, or working for or for any purpose participating in the event.

EACH OF THE UNDERSIGNED expressly acknowledges and agrees that the activities of the event are very dangerous and involve the risk of serious injury and/or death and/or property damage. EACH OF THE UNDERSIGNED further expressly agrees that the foregoing release, waiver, and indemnity agreement is intended to be as broad and inclusive as is permitted by law of the Province or State in which the event is conducted and that if any portion thereof is held invalid, it is agreed that the balance shall, notwithstanding, continue in full legal force and effect.

THE UNDERSIGNED HAS READ AND VOLUNTARILY SIGNS THE RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT, and further agrees that no oral representations, statements or inducements apart from the foregoing written agreement have been made.

Prior to being allowed to enter the pit area at the ARCA May 2, 1987 race, plaintiff obtained a "Pit Permit" and executed additional releases in favor of all defendants involved in the racing event:

I hereby release speedway owner, operator, promoter and any other person or persons connected with the race meet for which this Pit Permit has been issued from all liability for personal injury or property damage while preparing, practicing, qualifying or participating in or attending said race meet.

When signing in *before* being issued the Pit Permit, plaintiff executed another "RELEASE AND WAIVER OF LIABILITY AND INDEMNITY AGREEMENT" which

**1096**

contained the same language which appeared in plaintiff's membership application.

In opposition to the motions for judgment, Rommell presented an affidavit stating that he did not realize the portent of the documents and that he signed them with the understanding that he was only signing to get into the pit area. We will refer to additional facts in our discussion as they apply to the warranty issue.

## DISCUSSION

■ The Alabama Supreme Court has ruled that pre-race releases are valid and not void against public policy, *Barnes v. Birmingham International Raceway*, 551 So.2d 929 (Ala.1989). Here, the written releases and indemnification agreements speak for themselves. Plaintiff was a man of mature years; he had had experience in the civil and criminal court systems; he had seen similar documents many times before and was well acquainted with race course procedures. His affidavit denying that he understood the releases which he signed is insufficient to avoid the binding effect of those written documents. "Participation in automobile races is a voluntary undertaking of a hazardous activity, and releases from liability, when voluntarily entered into, should be enforced." *Barnes v. Birmingham International Raceway, Inc., supra*, at p. 932. The trial court properly sustained defendants' motions for summary judgment upon all of plaintiff's negligence claims.

The trial court recognized that the releases which plaintiff signed did not release any claims for wanton conduct, and the question of whether there was evidence of such conduct was considered as a separate issue.[7]

■ We first note that plaintiff did not present any evidence of wanton conduct on the part of the individual defendants

Wayne Smith, Jimmy Human, Bruce Beauchamp, or other members of the pit crew or of Bill Scott, the driver of the race car. The only evidence of such conduct was directed toward ARCA and Speedway, and the trial court found that such evidence was insufficient to present a jury question on the issue.

■ Under Alabama law, wanton conduct "is the conscious doing of some act or the omission of some duty (by one who has) knowledge of the existing conditions, and (who is) conscious that from the doing of such act or omission of such duty injury will likely or probably result." *Copeland v. Pike Liberal Arts School*, 553 So.2d 100 (1989), quoting *Kilcrease v. Harris*, 288 Ala. 245, 251, 259 So.2d 797, 801 (1972).[8] When a person from his knowledge of existing conditions and circumstances is conscious that his conduct will probably result in injury, yet he acts with reckless indifference or disregard of the natural or probable consequences of his act or failure to act, he would be found liable for wantonness. *See Lee v. Ledsinger* 577 So.2d 900, 903 (1991), citing *Reed v. Brunson*, 527 So.2d 102, 119–20 (Ala.1988).

■ A finding of wanton conduct depends upon circumstances, and must be based upon facts beyond mere negligence. In *Yamaha Motor Company, Ltd. v. Thornton*, 579 So.2d 619, 623 (Ala.1991), the court, quoting *Central Alabama Electric Cooperative v. Tapley*, 546 So.2d 371 (Ala.1989), stated the law in this manner:

> What constitutes wanton misconduct depends upon the facts presented in each particular case.... In Lynn Strickland Sales & Service, Inc. v. Aero–Lane Fabricators, Inc., 510 So.2d 142 (Ala.1987), the majority of this Court made it perfectly clear that wantonness, which requires some degree of conscious culpability, is

---

7. *Barnes v. Birmingham Raceway, supra,* held that pre-race releases are invalid and contrary to public policy as to *wanton or willful conduct,* overruling a contrary finding in *Young v. City of Gadsden,* 482 So.2d 1158 (Ala.1985).

8. Section 6–11–20(b)(3) of the Alabama Code, defines "wantonness" as "conduct which is carried on with a reckless or conscious disregard of the rights and safety of others." See *Berry v. Fife,* 590 So.2d 884 (Ala.1991), and *Shoals Ford, Inc. v. Clardy,* 588 So.2d 879 (Ala.1991).

not to be confused with negligence (i.e., mere inadvertence):

"Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury...." 546 So.2d at 379.[9]

In *Bonner v. Electric Power Board of the City of Scottsboro*, 583 So.2d 260 (1991), plaintiffs alleged negligence and wantonness by the Power Board for failing to insulate electric lines, when a lineman knew that construction was going on in the area, and for wantonly failing to "ascertain the conditions at the Lozier plant, including the fact that a crane was being used to move steel beams under the (defendant's electric lines)." The court found that even though the lineman saw the crane and saw steel beams nearby, this would not "serve as a basis for the inference that (he) somehow knew or was conscious that the crane would be used to move the steel beams." Likewise, the fact that the manager of the Power Board knew that there was some construction going on at the plant was found to be inadequate to establish the knowledge required to establish wanton conduct.

■ Under Alabama law, when a party alleges wanton conduct and seeks only compensatory damages, the conduct, in all cases filed after June 11, 1987, must be proved by "substantial evidence" .. "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." *Berry v. Fife, supra.*

Under the record presented in this case, we agree that plaintiff failed to meet his burden of establishing wanton conduct. The primary issue, of course, is knowledge—whether it may be said that ARCA,

under all of the existing circumstances, knew that its conduct would probably result in injury to others.

On the date of the accident, ARCA required drivers to wear fireproof clothing but did not require members of pit crews to do so, and it did not supply fireproof clothing to pitmen. Sometime during the 1970's ARCA did offer a fireproofing service. Bob Loga, the ARCA representative, testified that: (Loga depo. pp. 112–114):

... since back in the early '70's like at Daytona we would dip coveralls and other things for people to wear if they would bring them to us. The first race of the year, we would dip their clothes for them ... Anybody that was involved in racing that they wanted their stuff dipped, we would do it.

The purpose of dipping was to help protect people from possible fires, although ARCA had never had a fire at that time. The dipping was abandoned in the 1980's because,

... now the race person things are up a little bit more (sic) when they can afford to buy their own fire protective stuff instead of us dipping because most of them wouldn't wear it anyway because it was too hard. Can you imagine wearing a shirt dipped in Borax and sun dried? ... It got to the point where nobody would do it so we just stopped it.

It appears that pit fires were certainly not common during the 1970's and 1980's. Bob Loga, ARCA's manager, testified that Rommell's accident was the first pit fire he had heard of in stock car racing. Plaintiff believed that his fire was the first in a pit in an ARCA race, although he knew of one fire prior to his accident at a Michigan track during refueling which involved an "Indy" car. He testified that "Indy" cars and cars running in NASCAR races use methylene as fuel. Methylene is a high-octane fuel, used in faster cars, and you cannot see methylene burn. After his accident, there was a pit fire during refueling at the Michigan International Race Track

---

**9.** "The determination of whether conduct was wanton is a question of fact that turns upon the circumstances of each case. *Brown v. Turner,*

497 So.2d 1119 (Ala.1986)." *Mary Opal Kelley v. Smith,* 581 So.2d 1096, 1097 (Ala.1991).

in 1988 and another pit fire at Atlanta in March, 1989. Since these fires, many members of pit crews wear Nomex fireproof clothing similar to that worn by drivers.

In his affidavit, plaintiff stated that:

On May 2, 1987, no one ever offered me any fire protective clothing to wear before the ARCA 500 race started. I never saw any fire protective clothing or aprons in Bill Scott's pit area. No one ever told me or asked me to wear fire protective clothing on May 2, 1987. Had I been supplied fire protective clothing or required to wear it, I would have worn the same.

In finding that plaintiff had failed to sustain his burden, the trial court noted that while there was some evidence "that a few pit fires have occurred in the past at various tracks across the country," and that there had been a practice to dip pit crew clothing in fire-retardant liquid, such knowledge was not sufficient to support a claim of wanton conduct. As the court noted, "(t)he inference to be drawn could as easily be that the likelihood of a pit fire was greatly reduced and it was no longer necessary to dip the clothing."

It should also be noted that plaintiff himself, with many years of experience in auto racing as a member of pit crews and with knowledge of a previous fire in Michigan, did not consider the Saturday race at Talladega to be of such consequence as to require the use of a fire suit. Plaintiff had owned a fire suit for about six years prior to the accident and in previous years at Talladega he wore the pants to this suit during the *Sunday* NASCAR races but had never worn the suit during Saturday AS-CAR races.[10] He had brought this suit with him to Talladega because he planned to work the Sunday race in the pit crew for Buddy Arrington. He had worked in the crew for Arrington for five or six years, and he had "signed in" to work on Arrington's car No. 67. On Saturday, the day of the accident, he did not know that he was going to be helping anyone, and he had left his fire suit in his bag at the motel. It is significant that no one in the pit crew at the time of the accident was wearing fireproof clothing.[11] Since his accident, plaintiff does wear fireproof clothes when working as a member of a pit crew, and many others do the same.[12]

■ We have discussed this aspect of the case, not for the purpose of assessing plaintiff's own negligence or conduct, but for the purpose of examining the question of ASCAR's conduct in connection with its "knowledge of danger" and whether it acted "with consciousness that the doing or not doing of some act (would) likely result in injury."[13] In this respect, we agree that plaintiff's evidence was not sufficient to establish wanton conduct, and that the trial court properly entered summary judgment on the issue.

Having determined that defendants' motions for summary judgment upon plaintiff's claims against ASCAR, Scott, Smith & Beauchamp for alleged negligence and wanton conduct should be sustained, the trial court further found that all *tort* claims against the defendant Induction were barred by the Alabama two-year statute of limitations.[14]

---

**10.** Plaintiff stated that he had bought the suit thinking that one day he might be driving the race cars, and he knew that drivers were required to wear fireproof clothing.

**11.** There was testimony from plaintiff to the effect that the Saturday ARCA races were short races which usually did not require more than one pit stop for refueling. A news item reported that plaintiff stated that he had "decided not to wear his fire suit for the ARCA race. He wanted it to be clean for the Winston Cup event, and figured that Scott probably would make just one pit stop for fuel in the 500 kilometer ARCA event." Rommell Depo. p. 185.

**12.** It appears that sometime after the incident at Talladega, NASCAR and ASCAR recommended, but did not require, that members of pit crews wear fireproof clothing.

**13.** Contributory negligence and assumption of risk are generally not defenses to wanton conduct. *See Chance v. Dallas County, Alabama,* 456 So.2d 295 (1984).

**14.** The accident occurred on May 2, 1987, and the original complaint was filed in state court on May 2, 1989. After the case was removed to federal court, and on October 5, 1989, plaintiff filed a motion for leave to amend the complaint to add Induction Systems as a defendant. The

Plaintiff's claims against Induction based upon alleged breach of implied and express warranties were not affected by the above ruling, so the sole issue which remained before the trial court was whether the alleged defective nozzle manufactured by Induction was a "consumer good" for purposes of determining the applicable statute of limitations.

"When the defendant has made a prima facie showing that the statute of limitations defense is applicable, the plaintiff must prove that the action was brought within the limitations period." *Rivers Machinery Co., Inc. v. Barclay International, Inc.*, 553 So.2d 579, 580 (Ala.1989).

The relevant statute, Ala.Code Section 7–2–725 (1975), provides in pertinent part that:

> (1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered; *however, a cause of action for damages for injury to the person in the case of consumer goods shall accrue when the injury occurs.* (Emphasis supplied).

Thus, under state law, the limitations period for breach of warranty claims is four years from the date tender of delivery is made. The Redhead nozzles were manufactured by Inductions, but the exact date of that manufacture is not clear. Induction admits that the Redheads were manufactured for use on race cars. They are advertised to a limited audience and are not available for purchase at "retail stores." [15] Scott testified that he purchased the nozzles from Bosco Lowe Enterprises in 1978 when he built the car, and the nozzles accompanied the car through further transfers. The breach of warranty claim against Induction was not filed until October 5, 1987, clearly more than four years after the action accrued. The claim was therefore barred, unless the exception for consumer goods applies.

Section 7–9–109 of the Code of Alabama (1991) defines the classification of goods in this manner:

> Goods are:
>
> (1) "Consumer goods" if they are used or bought for use primarily for personal, family or household purposes;
>
> (2) "Equipment" if they are used or bought for use primarily in business (including farming or a profession) or by a debtor who is a nonprofit organization or a governmental subdivision or agency or if the goods are not included in the definitions of inventory, farm products or consumer goods;
>
> (3) "Farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states ... and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory;
>
> (4) "Inventory" if they are held by a person who holds them for sale or lease or to be furnished under. contracts of service or if he has so furnished them, or if they are raw materials, work in

court found that there is no fictitious party practice in federal court, and that the Alabama procedural rules did not apply to amendments which occurred after removal from the state court. Furthermore, the court found there could be no "relation back" because the motion to amend did not "substitute" Induction Systems for a sued fictitious party, but merely added a new party to the action.

**15.** Inductions Systems president stressed that the Redheads were designed for use in "professional automobile racing," or by "larger racing teams."

process or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment.

Under Alabama law, "(t)he classes of goods are mutually exclusive; the same property cannot at the same time and as to the same person be both equipment and inventory, for example. In borderline cases—a physician's car or a farmer's jeep which might be either consumer goods or equipment—*the principal use to which the property is put should be considered as determinative.* Goods can fall into different classes at different times; a radio is inventory in the hands of a dealer and consumer goods in the hands of a householder." Official Comment 2, emphasis supplied.

Defendant Induction claims that the nozzle is "equipment" because it was specially designed for race cars and was not adaptable for use in a "family car" situation. Defendant also claims that the winner of the race in question was to receive a purse, so the possibility of profit existed.

The trial court determined that summary judgment should be granted because Rommell "failed to show that the nozzle, when purchased by Wildcat Vans (or Jimmy Human, as the case may be), was a consumer good," and that plaintiff had failed "to show that the product, when initially sold, was used or bought for use primarily for personal, family or household purposes."

Under the evidence submitted upon the issue, we must find that the trial court erred in holding, as a matter of law, that the gasoline filler nozzle sold and distributed by Induction was "equipment" and not a "consumer good."

The exception for personal injury in the case of consumer goods to Section 7–2–725 by Alabama "is a departure from the standard version of the U.C.C. and is unique among the states adopting the Code. The legislature was specific in creating this exception from the tender of delivery rule, and it clearly applies only to personal injuries in the case of consumer goods." *Sim-*

*mons v. Clemco Industries,* 368 So.2d 509, 512 (1979).

Section 7–9–109 of the Ala.Code was authoritatively interpreted by the Supreme Court of Alabama in *Grimes v. Massey Ferguson, Inc.,* 355 So.2d 338 (1978), where plaintiff was injured while cutting weeds for a neighbor, driving a tractor and rotary cutter manufactured and sold by the various defendants. He had purchased the tractor and cutter in 1970 and 1971; the injury occurred on August 20, 1971, but the complaint was not filed until August 20, 1975, more than four years after the purchases. Plaintiff used the tractor in his farming operation, and he bought the rotary cutter "to keep the weeds cut down around the place" and for "cutting stalks in the fall of the year." The trial court found that the suit was barred by limitations, but the appellate court found that there was a genuine issue of fact presented as to whether the tractor and rotary cutter were "equipment" or "consumer goods," and that, accordingly, summary judgment was improperly granted. In so doing, the court stated:

> There are no reported cases to which we have been directed which state that a tractor and rotary cutter are "equipment," as defined in Title 7A (Sec.) 9–109 ... but we do not believe the definition is dependent upon the physical characteristics of the goods. *The pivotal language in the definition is "used or bought for use primarily for personal, family or household purposes."* Consequently, whether the tractor and rotary cutter were used or bought for use primarily for personal, family or household purposes, as appellant contends, or were used or bought for use primarily in business, including farming, as appellees claim, was a material fact question, which cannot be resolved as a matter of law on this record. (Emphasis supplied) [16]

Soon after the *Grimes* decision, the Alabama court had another occasion to interpret the exception for consumer goods in

---

**16.** The *Grimes* court also noted that "when a good cannot be said to have been purchased primarily for one particular use, then that term is classified as equipment."

*Wright v. Cutler–Hammer, Inc.*, 358 So.2d 444 (1978), where plaintiff was injured while installing an air conditioner unit in an overhead crane owned by his employer, Revere Copper & Brass Company. The crane had been used in plant operations for over 18 months prior to the accident. The court noted that Official Comment 3 to Section 7–9–109 specifically stated that "machinery in manufacturing is equipment," and that the crane in question was "a classic example of goods used as 'equipment'."

We believe that a fair inference which could be gained from plaintiff's evidence is that those involved in racing at the Talladega track on the date in question were enjoying a "hobby," or engaging in recreational activities, and that they were not involved in "business pursuits." Thus a jury could find that, as was customary, all of the men working in the pit were unpaid "volunteers" who were there simply because they enjoyed the sport and track atmosphere, and wanted "to practice" their particular skills in the pit. Plaintiff himself earned his living as a painting contractor and had never been paid for working any race during his lengthy experience with racing. Bruce Beauchamp worked building wood decks for Mark Stahl in Monroe, North Carolina. Jimmy Human, who bought Car No. 53 in April 1987, was a machinist and mechanic who owned his own business in Hartwell, Georgia, "Wildcat Custom Vans." He had a partner and 10 employees and bought vans, customized them, and resold them to dealers. As noted, he bought the car from Smith simply because of "racing fever" and without a business purpose. When he bought the car from Smith, he also received a 1976 one-ton Chevrolet truck and a trailer to haul the car, various race car parts, wheels, tires, etc., and also pit equipment which included jacks, two gas cans, air hoses and Redheads for the gas cans.

Wayne Smith, who acted as crew chief, owned several businesses in Royston, Georgia—including a body shop, an auto glass company, and a paint store selling automotive paint and supplies. He testified that "Most ARCA racing is a hobby or a sport."

He was not paid for working—he just came to "help out" Jimmy Human.

Bill Scott, the driver, had worked as a draftsman, auto technician, finish carpenter, and had been a building contractor for 15 years. At the time of the accident, he owned his own business, "Precision Welding and Auto Service." He had been racing since 1968 when he bought a "hobby class car" and drove it, and he had owned from 12 to 15 cars. As he noted, he had actually put together Car No. 53, although the chassis was built by Bosco Lowe Enterprises, and Scott had purchased the Redheads from that same company. Smith never paid him for driving the car. Scott testified that the general custom is that any cash prizes go to the owner of the car, and he may share prize money with the driver, but he testified that "Normally it took more money to run the car than the purse, so usually there was no money to me." Expenses always came out of the winnings first—such as entry fees, tires, auto parts, and living expenses on the road and at the track. He testified that he had never finished in the "top ten" in any ARCA race while driving for Smith, although he did have one "top ten" before that, and that he had never won more than $1,000.

We have discussed this evidence at some length to illustrate the basis of our conclusion that there was a genuine issue of disputed material fact as to whether or not the alleged defective nozzle was "used or bought for use" primarily for personal, recreational use.

In *Zeagler v. Custom Auto, Inc.*, 880 F.2d 1284 (11th Cir.1989), the purchaser of a used Mercedes automobile sued the dealer under the Alabama Deceptive Trade Practices Act. The Act provided a cause of action to "consumers," who were defined as "any natural person who buys goods or services for *personal, family* or *household* use." The trial court found that the purchasers were not "consumers" because they had purchased the car for resale. The court's order granting defendants' motion for summary judgment was reversed by this court upon a finding that the question

of the purchaser's status was properly one for the finder of fact. Although the purchaser had advertised the car for sale, he had made extensive personal use of the car and testified that he had never dealt in automobiles, had never procured cars for anyone else to sell, and that he had purchased the car "for the thrill of owning and driving a Mercedes." In reversing the order granting summary judgment, this court relied upon cases arising under Article 9 of the Uniform Commercial Code, which divides goods into classes of consumer goods, equipment, farm products and inventory.[17]

In view of the factual dispute concerning the primary purpose for the purchase and the actual use of the Redhead nozzle involved in this case, it was error for the trial court to enter summary judgment in favor of Induction Systems, Inc., upon plaintiff's breach of warranty claims.

## CONCLUSION

We affirm the district court's grant of summary judgment as to defendants on claims of Harry and Jean Rommell based on negligence and wanton conduct. We reverse the districts court's grant of summary judgment on the warranty claims.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings in accordance with this opinion.

---

**17.** E.g., *In re Ware,* 59 B.R. 549 (Bkrtcy. N.D.Ohio 1986), where court held that tools and equipment used in a remodeling business were consumer goods, where the business "did not occupy a significant percentage of the consumer's working hours", and the "business" was more of a sideline; *In re McFadden,* 18 B.R. 758 (Bkrtcy.E.D.Ark.1982) where a video was considered to be consumer goods when personal use exceeded business use. These cases were cited in *Zeagler* to support this courts conclusion that the ".. purchaser's status under the Act (UCC) is thus properly one for the finder of fact". (Footnote omitted).