[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1074 
The plaintiffs Billy Jack Cooper and his wife Tonya Cooper appeal from a summary judgment entered by the Talladega Circuit Court on June 20, 2000, for the defendants Nick Nicoletta, Richard Chatman, and Terry Christiansen. These defendants were coworkers of Billy Cooper. We affirm.
On May 7, 1999, the Coopers sued Nick Nicoletta, Richard Chatman, and fictitiously named defendants to recover compensatory and punitive damages based on injuries Billy Cooper had suffered while working at the Talladega plant of Georgia-Pacific Corporation. Tonya Cooper sought damages for loss of consortium. The Coopers alleged that Nicoletta, Chatman, and the fictitiously named defendants had removed, or had failed to install, a safety device or guard, or had bypassed an existing safety device or *Page 1075 
guard (see Ala. Code 1975, § 25-5-11(c)(1) and (2)) and that their action had resulted in Billy Cooper's being seriously injured.[1] On May 15, 2000, Terry Christiansen was added as a defendant by the Coopers' second amended complaint.
The Coopers' complaint, as amended, alleged that Nicoletta and Chatman had "willfully" injured Billy Cooper, within the meaning of §25-5-11(c)(1), and that Nicoletta, Chatman, and Christiansen had "willfully" removed a "safety device," within the meaning of §25-5-11(c)(2). On January 11, 2000, Nicoletta and Chatman moved for a summary judgment. Christiansen likewise moved for a summary judgment on May 31, 2000. These three defendants argued that the Coopers could not meet the requirements imposed by § 25-5-11(c) for showing that they had willfully injured Billy Cooper. The Coopers filed motions and briefs in opposition to the defendants' motions for summary judgment, on March 6, 2000, and June 16, 2000. They argued that the evidence created genuine issues of material fact and that the defendants were not entitled to a judgment as a matter of law. After receiving evidentiary submissions and conducting a hearing, the trial court entered a summary judgment for the defendants, without stating a specific rationale. The Coopers appealed.
The issues presented in this appeal are whether the trial court erred in determining that no genuine issues of material fact existed and in determining (1) that Nick Nicoletta and Richard Chatman were entitled to a judgment as a matter of law because they did not willfully cause Billy Cooper to be injured (within the contemplation of § 25-5-11(c)(1)); and in determining (2) that Nick Nicoletta, Richard Chatman, and Terry Christiansen were entitled to a judgment as a matter of law because they did not willfully or intentionally remove a safety guard or device (within the contemplation of § 25-5-11(c)(2)).
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993); Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)." *Page 1076 
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
During his work at the Georgia-Pacific plant on April 30, 1999, Billy Cooper was instructed by his supervisor, Richard Chatman, to empty one of the plant's timber-processing vats so that a broken drive chain could be repaired. The vat contained several thousand gallons of heated water mixed with caustic soda. The vats were usually emptied by means of a drain in the bottom of the vat, and the contents of the vats were then pumped into a holding tank. Portable pumps were available to empty a vat in the event the drain clogged and a "backflush" would not dislodge the clog. At his deposition, Cooper testified that the pumps had been used in the past to drain the vats when the drains became clogged. However, until Cooper had his accident, the usual procedure for dealing with a clogged drain was to empty the vat by removing an "outfeed" door near the bottom of the vat so that the contents would empty into a concrete moat that surrounded the vat. It appears that this procedure was used because it was faster and more effective than using the portable pumps. The outfeed door was designed to allow workers to enter the vat to make repairs after the vat had been emptied. It was not designed as a means of emptying the tank. During the work on April 30, the drain clogged. Chatman instructed Cooper to remove the bolts from the outfeed door, in order to empty the vat. The portable pumps were not used. When Cooper removed the bolts, the contents rapidly escaped from the vat and struck him. He suffered third-degree burns from the neck down; he is now disfigured and disabled.
Richard Chatman was the log yard supervisor at the Talladega plant, and Nick Nicoletta was the plant manager. Terry Christiansen was the general manager of Georgia-Pacific's plywood-manufacturing division. These defendants were Cooper's supervisory employees, and they knew that the removal of outfeed doors had been used in the past as a means of emptying the vats.
The record shows that before Cooper's injury, there was no established safety procedure requiring that the pumps be used to empty the vat if the drain became clogged. Also, no evidence presented to the trial court indicated that these pumps were a component of the vat. After Cooper's accident, it became Georgia-Pacific's safety procedure, at least at the Talladega plant, never to empty a vat through the outfeed door. The new procedure required that the portable pumps be used to empty a vat if the drain was clogged and could not be backflushed to dislodge the blockage. It also became mandatory safety procedure to wear protective clothing and gear while working on the vats.
 I. Ala. Code 1975, § 25-5-11(c)(1)
The Coopers first argue that the trial court erred in determining that the evidence required a conclusion that Nicoletta and Chatman had not, within the contemplation of § 25-5-11(c)(1), "willfully" caused Billy Cooper's injury. That section states:
 "(c) As used herein, `willful conduct' means any of the following:
 "(1) A purpose or intent or design to injure another; and if a person, with knowledge of the danger or peril to another, consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he or she is guilty of `willful conduct.'"
This Court, in Reed v. Brunson, 527 So.2d 102, 120 (Ala. 1988), established the degree of proof required to support a claim under that section. *Page 1077 
 "In § 25-5-14 the Legislature expressed concern over the rising costs of litigation among co-employees, as well as the disruptive effect that such litigation can have on workers. That concern indicates to us that the Legislature intended for an injured plaintiff to prove more than simply that he was compelled to work under circumstances that posed a foreseeable risk of harm to him or others (or circumstances from which harm could likely or even probably result), in order to maintain his action based on the `willfulness' of a co-employee defendant. To the contrary, we believe the Legislature sought to [ensure] that these kinds of cases would not be submitted to a jury without at least some evidence tending to show either 1) the reason why the co-employee defendant would want to intentionally injure the plaintiff, or someone else, or, 2) that a reasonable man in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his actions. (A purpose, intent, or design to injure another was not intended to be reasonably inferable from evidence showing only knowledge and appreciation of a risk of injury or death short of substantial certainty that injury or death would occur.) We think it safe to say that negligent, or even wanton, conduct is much more prevalent in the work place than conduct actually intended to cause injury or death. We think the Legislature has recognized this also, and, in so doing, has placed upon an injured worker a heavier burden in proving a purpose, intent, or design to injure on the part of a co-worker. This comports with the manifest intent of the Legislature that litigation among co-employees be restricted to those situations in which the plaintiff can show something more than what is usually sufficient to make out a case of negligence or wantonness."
(Quoted in Grimes v. Stewart, 628 So.2d 467, 468-69 (Ala. 1993).)
Cooper testified at deposition that he did not believe his supervisory employees had intended to injure him:
 "Q. Do you think that Richard Chatman intended to injure you?
"A. No.
 "Q. Do you know of any facts that would suggest that he intended to injure you?
"A. No.
 "Q. Do you know of any facts that would suggest that Richard Chatman had a reason to want to injure you?
"A. No.
 "Q. Do you think that Mr. Chatman knew that you would be injured when he had you remove the door?
"A. No."
Thus, we must consider whether Cooper made the second showing required under Reed, that is, whether "a reasonable man in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his actions." 527 So.2d at 120.
The record indicates that before April 30, 1999, no worker had suffered a similar injury while emptying a timber-processing vat at the Talladega plant. Cooper and each of the defendants all testified that they knew of no such injury that had occurred before Cooper's accident. Chatman also stated that the vat-emptying procedure Cooper was using had been used at least since the early 1990s. In Burkett v. Loma Machine Manufacturing,Inc., 552 So.2d 134 (Ala. 1989), this Court faced a similar situation, in which a condition had existed for an extended period, without an injury. In Burkett, the Court held that because the condition had existed for such *Page 1078 
a long period without an injury, it could not "be said that any co-employee defendant had knowledge that injury was substantially certain to follow." 552 So.2d at 139.
Likewise, we hold, under the circumstances of this case, including the fact that no similar injury had previously occurred while workers were emptying the vats, that neither Nicoletta nor Chatman could be found to have "willfully" injured Cooper, within the contemplation of §25-5-11(c)(1), under the theory that they were "substantially certain" that Cooper would be injured while emptying the vat through the outfeed door. "[E]ven though the defendant co-employees may have `perceived a risk of injury,' this perception is insufficient for `a jury to infer that [they] acted with a purpose to injure another.'" Burkett, 552 So.2d at 139 (citing Turnbow v. Kustom Kreation Vans, 535 So.2d 132, 134 (Ala. 1988)). Therefore, the trial court properly entered the summary judgment for Nicoletta and Chatman as to the plaintiffs' claim that the defendants had "willfully" — within the meaning of § 25-5-11(c)(1) — injured Billy Cooper.
 II. Ala. Code 1975, § 25-5-11(c)(2)
The Coopers also argue that the trial court erred in determining that the evidence required a conclusion that the defendants had not caused Billy Cooper's injury by willfully and intentionally, within the meaning of 25-5-11(c)(2), removing a safety device. Section § 25-5-11(c)(2) reads:
 "(c) As used herein, `willful conduct' means any of the following:
". . . .
 "(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine and was not done for the purpose of repair of the machine or was not part of an improvement or modification of the machine which rendered the safety device unnecessary or ineffective."
This Court has stated:
 "`[E]ver mindful of . . . the well-established law that the `Alabama [Workers'] Compensation Act' is to be construed liberally to effect its beneficent purposes, [we resolve] all reasonable doubts in favor of the claimant.' Moore [v. Reeves], 589 So.2d [173,] at 177 [(Ala. 1991)]. By the same token, however, Alabama law does not favor actions against co-employees, and this Court has consistently refused to allow recovery against co-employees outside the limited context of safety devices manufactured for machines."
Cumbie v. LA Contracting Co., 739 So.2d 1099, 1103 (Ala. 1999). Furthermore, this Court has concluded:
 "[T]he terms `safety device' and `safety guard' mean an invention or contrivance intended to protect against injury, damage, or loss that [ensures] or gives security that an accident will be prevented. Therefore, for purposes of construing these terms within § 25-5-11(c)(2), we hold that a `safety device' or `safety guard' is that which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer: it is not something *Page 1079 
that is a component part of the machine whose principal purpose is to facilitate or expedite the work."
Moore v. Reeves, 589 So.2d 173, 177 (Ala. 1991).
The Coopers argue that the removal of the outfeed door equates to the removal of a safety device or safety guard. However, the evidence is undisputed that the purpose of the outfeed door was for entering into the vat for repair purposes once the vat had been emptied.[2] The door was neither designed nor intended to be a means of emptying the vat. We find nothing in the record to support the Coopers' characterization of the outfeed door as a safety device. The limited purpose of the door was for entry into the vat after the vat had been emptied. When the door was properly sealed, it was no different from the other walls of the vat. In other words, it was "a component part of the machine whose principal purpose [was] to facilitate or expedite the work" (Moore v. Reeves,supra, 589 So.2d at 177) of entering into the vat once it was emptied.See Cumbie, supra, 739 So.2d at 1103 (Ala. 1999) (citing Moore v. Reeves
and holding that a crank handle intended for facilitating concrete work was not a safety device). Therefore, given this Court's definitions of the terms "safety device" and "safety guard," we conclude that the outfeed door is not such a device or guard. See also Thermal Components,Inc. v. Golden, 716 So.2d 1166 (Ala. 1998) (failure to provide protective clothing and failure to add guards not provided by the manufacturer of the product was not a removal of a "safety guard or safety device" within the meaning of § 25-5-11(c)(2)); and Burkett v. Loma Mach. Mfg.,Inc., supra, 552 So.2d at 138.
For the foregoing reasons, the trial court properly entered the summary judgment for Nicoletta and Chatman on the Coopers' claim under §25-5-11(c)(1), and for Nicoletta, Chatman, and Christiansen on the Coopers' additional claim under § 25-5-11(c)(2). That summary judgment is affirmed.
AFFIRMED.
Moore, C.J., and See, Brown, and Stuart, JJ., concur.
[1] Mr. Cooper is currently receiving $462.26 every week in workers' compensation benefits. Workers' compensation benefits will also pay for all his medical expenses relating to his injuries caused by the accident. He has also applied for benefits through the Social Security Administration.
[2] The Coopers' brief refers to the testimony of both Nicoletta and Chatman, as well as others, to show that the purpose of the outfeed door was for maintenance. For example, their brief states that "Chatman testified that the whole purpose of the vat door is not to drain the vat — rather it is for maintenance purposes — once the vat is drained, the door can be opened and a person can get into the vat to perform maintenance or clean out the bottom portion of the vat. . . ."