895 So.2d 851 (2004)
Ex parte Robert H. NEWTON, Sr. (In re Robert H. Newton, Sr. v. George Wright et al.)
1021368.
Supreme Court of Alabama.
March 5, 2004.
Rehearing Denied April 30, 2004.
*852 Davidson L. Laning of Laning & Laning, Birmingham, for petitioner.
Kenneth A. Hitson, Jr., and Pascal Bruijn of Nix, Holtsford, Gilliland, Higgins & Hitson, P.C., Daphne; and Bradley Byrne of Adams & Reese, LLP, Mobile, for respondents.
WOODALL, Justice.
This co-employee-liability action arose from an accident at Wright Pre-Cast Concrete, Inc., in which Robert H. Newton, Sr., an employee of Wright Pre-Cast Concrete, was seriously injured. Newton sued three co-employees  George Wright, the owner of the company; Georgette Wright, the manager; and Guy Wright, a supervisor (hereinafter referred to collectively as "the Wrights").
Newton made two claims against the Wrights, both alleging that they had engaged in willful conduct that resulted in his injuries. First, he claimed, under Ala.Code 1975, § 25-5-11(c)(1), that they had willfully failed to provide him a safe workplace. Second, he claimed, under § 25-5-11(c)(2), that the Wrights had removed a "safety device," by welding the device shut. The trial court entered a summary judgment in favor of the Wrights on both claims.
The Court of Civil Appeals affirmed the judgment of the trial court, without an opinion. Newton v. Wright (No. 2010342, March 14, 2003), 883 So.2d 741 (Ala.Civ.App.2003)(table). We granted certiorari review to determine whether Newton presented substantial evidence in support of his claims. We affirm in part and reverse in part.

I.
Viewed in the light most favorable to the nonmovant, Newton, the evidence indicates the following: Wright Pre-Cast Concrete manufactured concrete septic tanks. Newton's duties included operating a wire machine, which straightened rolls of the wire mesh used to reinforce the concrete septic tanks. On October 27, 1998, while operating the wire machine, Newton suffered serious injuries to his hands.
The wire machine on which Newton was injured had three rollers: (1) the upper roll (the "pinch roll"), (2) the lower roll (the "power roll"), and (3) the rear lower roll (the "pressure roll"). Coiled wire mesh had to be hand-fed between the pinch roll and the power roll; the mesh was pulled into the machine, where it was straightened as it passed over the pressure roll. As originally manufactured and installed at the plant, the wire machine had an upper-roll-release lever located on the material-entry side. When the lever was pulled, the pinch roll and the power roll separated immediately, eliminating the nip point *853 where they met. Robert T. Tolbert, a mechanical engineer, explained by affidavit the purposes of the upper-roll-release lever:
"The [upper] roll release lever serves two purposes. One purpose is to remove products from the slip roll when formed into a cylindrical or otherwise impractical to remove shape. This feature allows an operator the ability to form cylinders and remove them without having to cause deformation of the work piece. This is the functional purpose of this lever. In the application at Wright Pre-Cast Concrete, since they did not form cylinders with this machine, the lever served no functional purpose whatsoever. It neither facilitated nor expedited any work at Wright Pre-Cast.
"The second purpose of the lever is to remove, or extricate, materials or personnel during an upset condition, or an emergency situation. This is a safety function to prevent, or minimize, operator injuries. One example would be if an operator is rolling [a] thin, narrow strip, and it kinks and jams. With a power roll, sometimes there could be quite a jam before the operator sees the problem and stops the machine. If it weren't for the opening of the slip roll, the only way to remove it would require pulling, tugging, cutting, etc., to extricate the material. This would be a dangerous, risky operation for both man and machine. Another example would be in the unfortunate situation that personnel begin to become pulled into the in-running nip point between the pinch roll and the power roll. The [upper] roll release provides virtually instantaneous release of pressure between the rolls, allowing personnel to extricate themselves. During normal operation of the machine, operators' hands are regularly in the vicinity of an in-running nip point during feeding operations. Although a functional [upper] roll release may not always totally prevent an operator becoming entangled in the in-running nip point, serious injury could be minimized or eliminated by the operator being able to free himself by releasing pressure. The release of the pressure would then stop the operator from being pulled in at a certain, continual, unyielding pull, that a man (or woman) is incapable of overpowering or stopping."
(Emphasis added.)
Before Newton's accident, the wire machine had begun to malfunction. Specifically, the upper-roll-release lever began to pop out of position, causing the pinch roll and the power roll to separate, which prevented the wire mesh from being pulled into the machine. This problem first occurred after the employer welded metal beads to the surfaces of the pinch roll and the power roll to increase the pressure between those rolls. In order to keep the upper-roll-release lever from moving, the lever was welded shut.
At some point after the lever was welded shut, an operator was injured while he was feeding wire mesh into the machine. The operator was wearing gloves to protect his hands from the wire mesh. One of his gloves became caught in the wire mesh, causing his hand to be pulled into the nip point between the pinch roll and the power roll. As the result of the accident, the operator suffered the amputation of a finger. The Wrights were aware of this accident.
On October 27, 1998, while Newton was attempting to feed wire mesh into the machine, a glove on his left hand caught on a barb of the wire, and his left hand was pulled between the pinch roll and the power roll. As Newton attempted to extricate his left hand with his right hand, his right hand was also pulled into the machine. *854 His hands were freed from the wire machine by coworkers, who used a steel bar to break the weld securing the upper-roll-release lever. At the time of the accident, the lever was within Newton's reach.

II.
The standard applicable to our review of a ruling on a summary-judgment motion is well established.
"We review a summary judgment by the same standard the trial court uses when it rules on a motion for summary judgment. Long v. Bankers Life & Cas. Co., 294 Ala. 67, 70, 311 So.2d 328, 329 (1975). A trial court should grant a motion for summary judgment where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P.; Pitts v. Beasley, 706 So.2d 711, 712 (Ala.1997). If the movant makes a prima facie showing that there is no genuine issue of material fact, then the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794 (Ala.1989); Bean v. Craig, 557 So.2d 1249, 1252 (Ala.1990)."
Ex parte Martin, 733 So.2d 392, 394 (Ala.1999). Substantial evidence is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assur. Co. of Florida, 547 So.2d 870, 871 (Ala.1989). Newton argues that he presented substantial evidence in support of his claims under § 25-5-11(c)(1) and (c)(2).
The Workers' Compensation Act, § 25-5-1 et seq., Ala.Code 1975, provides immunity to co-employees "from civil liability for all causes of action except those based on willful conduct." § 25-5-14 (emphasis added). "Willful conduct," for the purposes of co-employee liability, is defined by § 25-5-11(c) to include, in pertinent part:
"(1) A purpose or intent or design to injure another; and if a person, with knowledge of the danger or peril to another, consciously pursues a course of conduct with a design, intent, and purpose of inflicting injury, then he or she is guilty of `willful conduct.'
"(2) The willful and intentional removal from a machine of a safety guard or safety device provided by the manufacturer of the machine with knowledge that injury or death would likely or probably result from the removal; provided, however, that removal of a guard or device shall not be willful conduct unless the removal did, in fact, increase the danger in the use of the machine...."
We will discuss each subsection separately.

III.
We first analyze Newton's claim under § 25-5-11(c)(1). Initially, it should be noted that Newton does not contend that the Wrights acted with any "purpose or intent or design to injure" him. Instead, in his petition, he contends that his injuries "result[ed] from activities by the [Wrights] which created a substantial certainty of injury." (Emphasis added.) The substantial-certainty standard can be traced to this Court's decision in Reed v. Brunson, 527 So.2d 102, 120 (Ala.1988), in which we stated, in pertinent part:
"[W]e believe the Legislature sought to [e]nsure that these kinds of cases would not be submitted to a jury without at least some evidence tending to show ... that a reasonable man in the position of the defendant would have known that a particular result (i.e., injury or death) was substantially certain to follow from his actions."
*855 (Emphasis added.) In response to Newton's claim, the Wrights argue on appeal, as they did in their summary-judgment motion, that Newton has offered no evidence indicating that they were "substantially certain" that injury would occur if employees, including Newton, continued to operate the wire machine in its known condition. Newton, on the other hand, contends that he "has presented substantial evidence that an injury was substantially certain to occur while operating the known and proven dangerous machine." Newton's brief, at 25. We agree with the Wrights.
The substantial-certainty standard is an exacting one. Indeed, "an injured plaintiff [must] prove more than simply that he was compelled to work under circumstances that posed a foreseeable risk of harm to him or others (or circumstances from which harm could likely or even probably result)." Reed, 527 So.2d at 120. In his petition for the writ of certiorari, Newton alleges that his claim under § 25-5-11(c)(1) "is supported by the fact that prior to [his] injury, another employee had suffered an amputation injury while performing the same task on the same dangerous and unguarded machine." However, the prior accident, standing alone, does not constitute substantial evidence indicating that the Wrights knew to a "substantial certainty" that injury would occur if employees, including Newton, continued to operate the wire machine in its known condition. While the record does not reflect the date of the earlier accident involving the machine, Guy Wright testified that the accident occurred "like years before [Newton] got hurt." During those years, by his own estimate, Newton had put between 2,000 and 5,000 rolls of wire mesh into the machine without suffering any injury. Other operators, including Georgette Wright, also operated the wire machine without injury after the earlier accident. Because Newton did not present substantial evidence in support of his claim under § 25-5-11(c)(1), the summary judgment for the Wrights as to that claim must be affirmed.

IV.
We now focus upon Newton's claim under § 25-5-11(c)(2). The principles relevant to our consideration of this claim were stated in Moore v. Reeves, 589 So.2d 173, 177-79 (Ala.1991):
"[W]e hold that a `safety device' or `safety guard' is that which is provided, principally, but not exclusively, as protection to an employee, which provides some shield between the employee and danger so as to prevent the employee from incurring injury while he is engaged in the performance of the service required of him by the employer: it is not something that is a component part of the machine whose principal purpose is to facilitate or expedite the work.
"....
"... [W]e hold that the failure to maintain and/or repair a safety guard or device provided by the manufacturer of a particular machine would be tantamount to the `removal of' or the `failure to install' a safety guard or device. To hold otherwise would allow supervisory employees to neglect the maintenance and repair of safety equipment provided to protect co-employees from injury, which by its very nature is a clear violation of public policy."
The substance of Newton's claim is stated clearly in his petition for the writ of certiorari:
"[T]he [Wrights] violated § 25-5-11(c)(2) in that they failed to maintain or repair a safety device provided with the machine as originally designed and manufactured, and this failure to maintain *856 and repair the safety device directly caused the amputation of [my] hands by the machine. The safety device, called an `upper-roll release,' had, in fact, been welded shut so that it was inoperable. Had it not been welded shut, [my] injuries could have been avoided or greatly reduced."
(Emphasis in original.) In response to Newton's claim, the Wrights argue on appeal, as they did in their summary-judgment motion, that the upper-roll-release lever was not a safety device, and that, even if it was such a device, welding it in place did not increase the danger in using the machine. Newton, on the other hand, contends that he presented substantial evidence creating a genuine issue of material fact as to this claim. We agree with Newton.
In their summary-judgment motion, the Wrights alleged that it was clear from the testimony of their engineering expert that the upper-roll-release lever was not principally a safety device, but, instead, the principal purpose of the lever was to facilitate the removal of tubular sheet material from the pinch roll. In response, Newton offered the testimony of Tolbert, his engineering expert, which clearly presented a genuine issue of material fact as to whether the principal purpose of the lever was to protect an employee or to facilitate the work. In order to agree with the Wrights' argument, we would have to ignore Tolbert's testimony concerning the safety functions of the lever. Although the Wrights ignore that testimony in their brief to this Court, we cannot do so.
Finally, the Wrights make a conclusory argument that, even if the upper-roll-release lever could be properly found to be a safety device, the fact that it was welded shut did not increase the risk in operating the machine. This argument merits little analysis, because Tolbert's testimony obviously provided substantial evidence to the contrary. Also, while the Wrights contend that Newton's ignorance of the function of the lever somehow supports their contention, it certainly does not. See Jackson v. Hill, 670 So.2d 917, 919 (Ala.1995)("Certainly, it was not the intention of the legislature to allow supervisors to fail to inform employees about safety devices so that the supervisors could remove them and then not be responsible for injuries resulting from the removal.").
Because Newton presented substantial evidence in support of his claim under § 25-5-11(c)(2), the summary judgment for the Wrights as to that claim must be reversed.

V.
For the foregoing reasons, the judgment of the Court of Civil Appeals is affirmed in part and reversed in part, and this cause is remanded for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, SEE, LYONS, BROWN, HARWOOD, and STUART, JJ., concur.
JOHNSTONE, J., concurs in part and dissents in part.
JOHNSTONE, Justice (concurring in part and dissenting in part).
I concur in reversing the summary judgment against the plaintiff on his claim under § 25-5-11(c)(2), Ala.Code 1975. I respectfully dissent from affirming the summary judgment against the plaintiff on his claim under § 25-5-11(c)(1). The defendants' conduct in modifying and providing the machine for the plaintiff's employment was at least substantially certain, *857 and indeed was virtually absolutely certain, to injure him or another employee. The only uncertainty was how much time would pass before the injury would be sustained.